Sandra C. BROOKS and William
C. Jacobs, Appellants,

v.

The LEXINGTON–FAYETTE URBAN
COUNTY HOUSING AUTHORITY;
Austin J. Simms; Margaret Burch;
and Jim DeSpain, Appellees.

No. 2001–SC–0816–DG.

Supreme Court of Kentucky.

Jan. 22, 2004.

As Modified on Denial of Rehearing
May 20, 2004.

William C. Jacobs, Lexington, Counsel for Appellants.

Winifred Bryant Becker, Philip C. Eschels, Greenebaum, Doll & McDonald, PLLC, Louisville, Counsel for Appellees.

JOHNSTONE, Justice.

This is an employment discrimination and retaliation case, which was tried under the Kentucky Civil Rights Act ("KCRA")

in the Fayette Circuit Court. At trial, Appellant, Sandra Brooks, claimed that Appellees, The Lexington–Fayette Urban County Housing Authority, et al., unlawfully discriminated against her on the basis of her race and unlawfully retaliated against her for filing a discrimination complaint. Brooks lost on the discrimination claim, but prevailed on the retaliation claim. The Court of Appeals affirmed the judgment against Brooks on the discrimination claim and reversed the judgment in her favor on the retaliation claim. We granted discretionary review to address a number of important issues, including the application of the after-acquired-evidence doctrine and whether unlawful retaliation under Kentucky law is construed consistently with federal law. For the reasons set forth below, we affirm in part, reverse in part, and remand.

### ISSUES

### I. Discrimination: Directed Verdict

### A. Facts

In 1987, The Lexington–Fayette Urban County Housing Authority ("the Housing Authority") advertised in the Lexington paper an opening for an assistant housing manager. Brooks, who is African–American, applied and was interviewed for the position. During the course of the interview process, Brooks was told that a position for a work order clerk was also available. While Brooks gave permission to be considered for the work order clerk position, she emphasized her strong preference for the better paying assistant housing manager position.

At the conclusion of the interview process, Brooks was the top candidate for both positions, although Brooks did not know this at the time. But instead of being offered the assistant housing manager position, the Housing Authority offered her the work order clerk position and

Brooks accepted. The assistant housing manager position was then readvertised. When Brooks learned that she had been the top candidate for the position, she sought to reapply but was told that Housing Authority policy prohibited her from applying for another position during her one-year probationary period. Ultimately, a white female was hired for the position.

In 1990, a new assistant housing manager position was created. Brooks applied for the job and was one of the top three candidates for the position at the conclusion of the interview process. Brooks underwent a second interview with the designated supervisor for the position, Shirley Cook. At trial, Cook testified that she was unsatisfied with all three candidates and reported this to Austin Simms, who was the Housing Authority's executive director and ultimately responsible for the hiring decision. Simms indicated to Cook that he would like to see Brooks get the job. At Simms' request, Cook took Brooks to lunch to re-evaluate her. Cook's opinion of Brooks' qualifications did not change and the assistant housing manager position was readvertised.

Brooks again reapplied. At the conclusion of the interview process, Brooks did not emerge as a top candidate, and a white female among the top three candidates filled the position.

On appeal, Brooks argues that, after she established a *prima facie* case of discrimination in connection with her initial hire in 1987, the failure to consider her for the readvertised position in 1987 and the failure to promote her in 1990, the Housing Authority failed to articulate a legitimate non-discriminatory reason for its actions. Therefore, she argues that she was entitled to a directed verdict on her discrimination claims. We disagree.

### B. Discussion

██ It is unlawful for an employer to "fail or refuse to hire ... any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment, because of the individual's race ...." KRS 344.040(1). In a claim arising under the statute, the plaintiff-employee bears the initial burden of proving a *prima facie* case of discrimination. *Jefferson County v. Zaring,* 91 S.W.3d 583, 590 (2002), *citing McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). One way this burden can be met is by proof that the plaintiff (1) is a member of a protected class, (2) was qualified for and applied for an available position, (3) did not receive the job, and (4) that the position remained open and the employer sought other applicants. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 678. Upon establishing a *prima facie* case of discrimination, the burden shifts to the defendant-employer to articulate a "legitimate non-discriminatory" reason for its action. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207, 215 (1981). After the defendant has met this burden, "the *McDonnell Douglas* framework is no longer relevant." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 510, 113 S.Ct. 2742, 2748, 125 L.Ed.2d 407, 418 (1993). This is because "the *McDonnell Douglas* presumption is a *procedural* device, designed only to establish an order of proof and production." *Id.* at 521, 113 S.Ct. at 2755, 125 L.Ed.2d at 425 (emphasis in original). The case then proceeds with the plaintiff having to meet her burden of persuading the trier of fact by a preponderance of the evidence that the defendant unlawfully retaliated against her. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105, 117 (2000).

██ On a motion for directed verdict, failure to introduce evidence of a legitimate, non-discriminatory reason for its allegedly discriminatory employment practice is fatal to the defendant-employer's case where the plaintiff has established a *prima facie* case of discrimination, *St. Mary's Honor Center,* 509 U.S. at 509, 113 S.Ct. at 2748, 125 L.Ed.2d at 417–18 (1993), because the defendant-employer has failed to rebut the presumption of discriminatory animus created by the plaintiff's *prima facie* case. We now turn to Brooks' argument that she was entitled to a directed verdict because the Housing Authority failed to produce evidence of a non-discriminatory reason for not hiring her as, or promoting her to, an assistant housing manager.

### i. Initial Application—1987

As to the initial failure to hire Brooks in 1987, both Brooks and the Housing Authority rely on the reason articulated by the trial judge for denying Brooks' motion for a directed verdict. This was Austin Simms' testimony that Brooks was not hired for the assistant housing manager position because she had already been hired for the work order clerk position. That is, the Housing Authority could not hire her for both positions. But on appeal, we are not limited to the reasons articulated by the trial judge for denying Brooks' directed verdict motion.

██ The standard of review of a trial court's denial of a motion for directed verdict is set forth in *Lewis v. Bledsoe Surface Mining Co.,* Ky., 798 S.W.2d 459 (1990):

Upon review of the evidence supporting a judgment entered upon a jury verdict, the role of an appellate court is limited to determining whether the trial court erred in failing to grant the motion for directed verdict. All evidence which

favors the prevailing party must be taken as true and the reviewing court is not at liberty to determine credibility or the weight which should be given to the evidence, these being functions reserved to the trier of fact. The prevailing party is entitled to all reasonable inferences which may be drawn from the evidence. Upon completion of such an evidentiary review, the appellate court must determine whether the verdict rendered is " 'palpably or flagrantly' against the evidence so as 'to indicate that it was reached as a result of passion or prejudice.' "

*Id.* at 461–62 (internal citations omitted). Thus, our review is independent of the grounds relied on or stated by the trial court to deny the directed verdict motion. Rather, we must make our own review of the entire record to determine whether the trial court's ruling was clearly erroneous. *See Roethke v. Sanger,* Ky., 68 S.W.3d 352, 365 (2001). Upon this review, we conclude that the trial court's ruling was not clearly erroneous.

■ First, we conclude that the reason relied on by the trial court was not, in isolation, a legitimate reason for not initially hiring Brooks as an assistant manager.

The trouble with the Housing Authority's argument that it could not hire Brooks for the assistant housing manager position because it hired her as a work order clerk is that there is no evidence as to the timing of these two employment decisions. That is, if the decision to readvertise the assistant housing manager position was made before Brooks was offered and accepted the work order clerk position, then the Housing Authority's asserted reason is no reason at all. If the decision to readvertise the assistant housing manager position was made concurrently with the decision to hire Brooks as a work order clerk, then, again the Housing Authority's

asserted reason is no reason at all, because the decision to hire her as a work order clerk necessarily included a simultaneous rejection of her for the assistant housing manager position. That is, under the concurrent decision scenario, the Housing Authority's decision to hire Brooks as a work order clerk had no bearing on the decision to readvertise the assistant housing manager position. The Housing Authority's asserted reason is only a legitimate reason if the decision to hire Brooks for the work order clerk position was made *before* the decision was made to readvertise the assistant housing manager position. But the Housing Authority does not assert or imply that this was the case. At best, the Housing Authority's asserted reason implies that the decision on both positions was made simultaneously, which is not a legitimate reason. This, however, does not end the discussion.

■ In most failure-to-hire or failure-to-promote cases, the defendant-employer's asserted reason for not hiring or not promoting the plaintiff-employee is that the person actually hired or promoted was the better candidate. *See, e.g., Kentucky Center for the Arts v. Handley,* Ky.App., 827 S.W.2d 697, 700 (1992). In the case where the position is left unfilled, this is not a viable route for introducing a non-discriminatory reason for the failure to hire or to promote. But the reason why the job was not filled by any of the available applicants may provide a non-discriminatory reason. That is the case here.

■ The trial in the underlying case occurred about a decade after the initial failure to hire Brooks as an assistant housing manager in 1987. Austin Simms was the executive director of the Housing Authority, and it was his decision not to fill the position at the time. Somewhat understandably, he testified that he could not remember why the assistant housing man-

ager position was readvertised rather than filled by Brooks or one of the other candidates for the job. While a naked lapse of memory is not sufficient to create a genuine issue of material fact, *see Carter v. Newsday, Inc.,* 528 F.Supp. 1187, 1191 (E.D.N.Y.1981) (deposition statements to the effect that the deponent "does not remember" a particular fact, does not create a genuine issue of fact that precludes granting summary judgment), Simms also testified that readvertising a position was a common practice for the Housing Authority when, for some reason, the personnel director was not comfortable with any of the top candidates recommended by the interview panel. We believe that this testimony was sufficient to meet the Housing Authority's burden of producing evidence of non-discriminatory reasons why Brooks was not hired as an assistant housing manager in 1987.

■■■ To state the obvious, an employer necessarily must hire and sometimes fire employees. Employers being human, over time the individual and specific reasons for making these decisions fade from memory. Thus, to make failure to remember the reason for any particular employment decision fatal to a defense to a discrimination claim would place an intolerable burden on employers to document the reason for every employment decision as insurance against future lawsuits. Therefore, we hold that, where an employer claims that the actual reason cannot be recalled, the employer may rely on normal business practices and exemplary reasons consistent with those practices when called upon under the *McDonnell Douglas* framework of producing a non-discriminatory reason to rebut a plaintiff's *prima facie* case of discrimination.

Before concluding our discussion on this issue, we take a moment to reply to Justice Cooper's dissenting opinion, which takes a chicken-little response to our recent decision in *Burchett v. Commonwealth,* Ky., 98 S.W.3d 492 (2003). With all due respect, the sky is not falling. *Burchett* does not hold that all that is admissible under FRE 406 is inadmissible in Kentucky. Rather, *Burchett* held that evidence that the defendant smoked a marijuana joint every morning was not admissible to show that he had smoked marijuana on the same day he was involved in an automobile collision in which the driver of the other vehicle was killed. *Id.* at 499. This holding was neither new nor novel. The only remarkable thing about the opinion is the discussion of whether such evidence—which, as conceded by the author of the dissent, had long been excluded under Kentucky common law—was now admissible under the Kentucky Rules of Evidence. We held that it was not.

In reaching our holding in *Burchett,* we relied on a number of pre-KRE cases that held that evidence of habit or custom is not admissible to show that a party acted either negligently or non-negligently on a particular day or time in question. *See, e.g., Cincinnati, N.O. & T.P. Ry. Co. v. Hare's Adm'x,* 297 Ky. 5, 178 S.W.2d 835 (1944), *overruled on other grounds, Louisville & N.R. Co. v. Fisher,* 357 S.W.2d 683 (1962). (Evidence of deceased's custom of carefully going over railroad crossings was not admissible to show that the decedent acted non-negligently on the day he was struck and killed by a train while going over a crossing.) But our holding in *Burchett* does not affect all the types of evidence that might arguably be categorized as habit evidence under FRE 406.

For example, if one uses the annotation to FRE 406 as a guide, evidence regarding custom and usage in a particular industry is admissible evidence under the rule to assist the trial court to determine the

meaning of an ambiguous contract. *See Major v. Bishop,* 462 F.2d 1277, 1279 (10th Cir.1972). Likewise, the annotation points to evidence of custom and practice within a particular industry, group, or organization as being admissible under the rule as evidence "bearing on the standard of care in determining negligence." *Muncie Aviation Corp. v. Party Doll Fleet, Inc.,* 519 F.2d 1178, 1180 (5th Cir.1975). Business custom, practice, and usage have long been admissible in Kentucky for these same purposes. *See, e.g., Martin v. Ben P. Eubank Lumber Co.,* Ky., 395 S.W.2d 385, 386 (1965) (The "course of dealing between parties and any usage of trade may be competent to explain any ambiguities in a contract.") (internal quotation marks omitted); *Bass v. Williams,* Ky.App., 839 S.W.2d 559, 565 (1992) ("While custom and usage may, under some circumstances, establish a standard of care, it may not negate an established standard.")

To satisfy the curiosity expressed in the dissent, we explain that the above-cited cases illustrate the point that *Burchett* merely reaffirmed the pre-KRE, common-law rule that evidence of a party's particular "habit" is not admissible to prove that the party acted either negligently or non-negligently in accordance with his or her habit. *Burchett* does not exclude all evidence that falls within FRE 406's umbrella of admissibility. It does not preclude evidence of the custom and practice in an industry to prove the terms of an ambiguous contract. Likewise, it does not preclude introduction of the evidence of an entity's regular business practices that is part of the foundation necessary to introduce business records under the hearsay exception of KRE 803(6). And *Burchett* certainly does not preclude evidence of a defendant-employer's hiring practices and criteria in an employment-discrimination case. Thus, the dissent's claim of "fowl" in

response to our reasoning is, in actuality, a cry of "wolf."

### ii. Readvertised Position–1987

After the assistant housing manager position went unfilled, Brooks sought to reapply for the position. At trial, Simms testified that the Housing Authority policy prohibited Brooks from applying for another position during her one-year probationary period, which began when she was hired as a work order clerk. He further testified that this policy was enforced against blacks and whites alike. This stated reason for not promoting her to the assistant housing manager position was sufficient to meet the Housing Authority's burden under the *McDonnell Douglas* framework.

### iii. Failure to Promote—1990

Brooks' argument on this point does not go to the substance of the Housing Authority's proffered reason for not promoting her. Rather, she argues that the testimony came from the wrong person. At trial, Shirley Cook testified that, at the conclusion of the interview process, she was not satisfied with any of the top three candidates who emerged from the interviews for the new assistant housing manager position created in 1990. Brooks argues that this testimony was not relevant because Cook was not the person responsible for the ultimate hiring decision. Rather, that decision was for Austin Simms alone to make. Because Simms failed to testify as to why Brooks was not hired, Brooks argues that the Housing Authority failed to meet its burden under the *McDonnell Douglas* framework. But this argument ignores the import of Simms' testimony, which implied that he relied on the recommendation of others when making employment decisions. This implication was reinforced by testimony that Simms asked Cook to take Brooks to lunch

in hopes of changing her recommendation. Thus, the Housing Authority produced sufficient evidence of a non-discriminatory reason why Brooks was not promoted in 1990.

## II. Retaliation: Adverse Action

On cross-appeal, the Housing Authority argues that the trial court erred by denying its motion for a directed verdict on Brooks' retaliation claim. Before we reach the merits of the issue, we need to resolve the question of what level of retaliatory acts by an employer that a plaintiff must show to establish a *prima facie* retaliation claim under the KCRA. The parties' disagreement on this point concerns the differences between the federal retaliation statute and the Kentucky retaliation statute.

KRS 344.280(1) makes it unlawful for one or more persons "[t]o retaliate or discriminate *in any manner* against a person ... because he has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding, or hearing under the chapter." (Emphasis added). Whereas, 42 U.S.C. § 2000e–3 makes it unlawful for an "employer to discriminate *against* any of his employees or applicants for employment." (Emphasis added). Thus, the question arises whether "discriminate in any manner" is broader in scope than "discriminate against." We conclude that there are no meaningful distinctions between the two standards.

In *Meyers v. Chapman Printing Co.,* Ky., 840 S.W.2d 814 (1992), we were called on to interpret KRS 344.040 in connection with a claim for sexual harassment made under the statute. *Id.* at 820. KRS 344.040 makes it unlawful for an employer to "discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's ... sex." We interpreted the statute consistent with federal law and held that for "sexual harassment to be actionable, it must be *sufficiently severe or pervasive* to alter the conditions of the victim's employment and create an abusive working environment." *Id.* at 821 (emphasis in original and internal quotation marks and brackets omitted), quoting *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49, 60 (1986). Granted, KRS 344.040 mirrors the federal statute's use of "discriminate against" rather than the KCRA's use of "discriminate in any manner against," and so, on the surface, *Meyers'* reliance on federal law sheds no light on the argument at hand, *i.e.,* whether there is a substantive difference between "discriminate" and "discriminate in any manner." But going deeper, the definition of "discrimination" found in KRS 344.010(5) illuminates the path to a resolution.

"*Discrimination* means *any* direct or indirect act or practice of exclusion, distinction, restriction, segregation, limitation, refusal, denial, or any other act or practice of differentiation or preference in the treatment of a person or persons...." KRS 344.010(5) (emphasis added). (Title VII does not define the term "discrimination.") Under Brooks' argument, the KCRA's use of the word "any" should have led the *Meyers'* Court to hold that a broader category of claims for "sexual harassment" are actionable under Kentucky law than are available under federal law, but it did not. The most likely reasons for this are that construing the KCRA consistent with federal law (1) is consistent with the KCRA's stated purpose to "provide for execution within the state of the policies embodied in the Federal Civil Rights Act of 1964 as amended," KRS 344.020(1)(a); (2) promotes predictability in the law; (3) discourages forum shopping; and (4) attempts to strike an

appropriate balance between an employer's legitimate interests in conducting its business with minimal governmental interference *and* its employees' legitimate interests in being treated with dignity and respect on the basis of merit and individual achievement. Likewise, we believe the same interests are served by interpreting unlawful retaliation under the KCRA consistent with the interpretation of unlawful retaliation under federal law. This means that, as part of her *prima facie* case of retaliation, Brooks had to show that she suffered an "adverse employment action" as that term is defined under federal law.

Under federal law, a "plaintiff must identify a materially adverse change in the terms and conditions of his employment to state a claim for retaliation under Title VII." *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir.1999).

A materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Id.*, quoting *Crady v. Liberty National Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir.1993). Having resolved this issue, we can now turn to the question of whether Brooks' established a *prima facie* case of retaliation

### III. Directed Verdict: Retaliation

#### A. Facts

Brooks filed a formal discrimination complaint with the Lexington–Fayette Urban County Human Rights Commission ("the Human Rights Commission") on July 2, 1991. By letter sent the same day, the Human Rights Commission sent formal notification of the complaint filed by Brooks to Alan Sisk, who was the Housing Authority's personnel manager.

On October 28, 1991, Brooks sent a letter or a memo to Suzanne Feng, who was Brooks' supervisor, advising her to expect a telephone call from the Human Rights Commission regarding the lunch meeting she had with Shirley Cook in connection with Brooks' application for the new assistant housing manager position created in 1990. In the letter, Brooks asked Feng to be truthful with the investigator. On November 8, 1991, Brooks was called to a meeting in the board room by Jim DeSpain, who was deputy director of administrative services. Feng and Sisk were also in attendance. Both parties dispute what occurred at this meeting; however, in light of the standard of review for directed verdict, we will accept Brooks' statement of what occurred.

According to Brooks, the meeting was very adversarial in nature. When Brooks asked if everything was "OK," DeSpain stated that he was in charge of the meeting and that if she said anything he did not like, he would write her up for insubordination and fire her.

DeSpain proceeded to tell Brooks that on November 7, 1991, he observed her reading a newspaper at the receptionist's desk for 25 to 30 minutes immediately prior to her lunch break. According to DeSpain, after Brooks finished reading the paper, she proceeded to take her entire lunch break. DeSpain also told Brooks that, on the same day, he observed her talking with a man outside the building for an extended period of time during work hours. DeSpain then accused Brooks of making an accounting error on a HUD report which could have cost the Housing

Authority thousands of dollars. When Brooks told DeSpain that in reality she had found the error on a form which he had principally prepared and brought the error to his attention, DeSpain became angry and "slapped" his hand back and forth at her. Although DeSpain did not physically touch Brooks, she testified that his hand was so close that she could feel the hairs on the back of his fingers. At that point, Brooks began to cry and asked to leave the room.

When Brooks returned to the meeting, Simms was present and had taken charge. Simms then asked Brooks what was going on. She told him that DeSpain was making false accusations against her. After discussing DeSpain's concerns, Simms told Brooks that she should get permission from her supervisor to leave her desk for any reason. Brooks asked Simms if other employees were required to obtain permission to leave their desks. Simms told her not to worry about anyone else. Although Simms denied telling Brooks to obtain permission to leave her desk, there was no dispute that following the meeting Brooks did not leave her desk for any reason without asking Feng's permission to do so. As a result of the November 8 meeting, Brooks filed a sworn charge of retaliation with the Human Rights Commission on November 14, 1991.

Brooks testified that one day when she was preparing to leave her desk to go on break, she saw a sheriff come into the Housing Authority to serve Simms with her federal discrimination and retaliation complaint.[1] Before Brooks' break was over, Feng came into the break room and told her that her break was over. Brooks accompanied Feng to her office, where Feng told her that Sisk had just shortened her break time from fifteen minutes to ten.

On cross-appeal, the Housing Authority argues that the above facts failed to support, as a matter of law, Brooks' retaliation claim. We disagree.

**B. Discussion**

 A *prima facie* case of retaliation requires a plaintiff to demonstrate "(1) that plaintiff engaged in an activity protected by Title VII; (2) that the exercise of his civil rights was known by the defendant; (3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Christopher v. Stouder Memorial Hospital*, 936 F.2d 870, 877 (6th Cir.1991), *cert. denied*, 502 U.S. 1013, 112 S.Ct. 658, 116 L.Ed.2d 749 (1991). The Housing Authority first argues that Brooks failed to prove the adverse-action element of her retaliation case. It next argues that Brooks failed to prove the causal-connection element of her case. We disagree with both of these arguments.

 A material modification in duties and loss of prestige may rise to the level of adverse action. In *Kocsis v. Multi–Care Management, Inc.*, 97 F.3d 876, 886–87 (6th Cir.1996), the Sixth Circuit held that the trial court properly granted the defendant-employer's summary judgment motion on the appellant's disability-discrimination claim because she failed to show a materially adverse employment action. *Id.* at 887. In so holding, the *Kocsis* Court reasoned "[I]n her new job as unit RN, she enjoyed the same (or a greater) rate of pay and benefits, and her duties were not materially modified. She submitted no evi-

1. Brooks first filed suit against the Housing Authority in federal district court, which com- plaint was dismissed without prejudice.

dence that she lost any prestige in her position because of her working conditions or her title change." *Id.* at 886–87. Brooks' evidence would support a finding that her duties were materially modified by being restricted to her desk.

Brooks testified that she was singled out from other Housing Authority employees and was required to ask permission from her immediate supervisor every time she left her desk. This restriction applied for any reason, including having to use the bathroom, checking a file, acting as an interpreter for deaf clients and applicants, etc. Because no other employee was so restricted, it was objectively and subjectively humiliating. This change in Brooks' duties subjected her to greater supervisory scrutiny, carried an imputed diminished level of trust, and marked an objective decrease in prestige. It was more than a *de minimis* employment action. *See, e.g., Ford v. General Motors Corp.*, 305 F.3d 545, 554 (6th Cir.2002). It was sufficient evidence of adverse employment action to withstand a motion for a directed verdict. We now turn to the Housing Authority's alternative argument that Brooks failed to establish a causal connection between the adverse employment action and filing the discrimination complaint.

■■■■ In cases where there is no direct evidence of a causal connection, the causal connection of a *prima facie* case of retaliation must be established through circumstantial evidence. *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000). Circumstantial evidence of a causal connection is "evidence sufficient to raise the inference that [the] protected activity was the likely reason for the adverse action." *Id.* at 566. In most cases, this requires proof that (1) the decision maker responsible for making the adverse decision was aware of the protected activity at the time that the adverse decision was made, and (2) there is a close temporal relationship between the protected activity and the adverse action. *See, e.g., Clark County School District v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509, 515 (2001).

■■■■ In this case, there is no argument concerning awareness of the protected activity. The evidence established that the Housing Authority management personnel responsible for the employment actions in question first learned of Brooks' discrimination complaint sometime in July 1991. The alleged adverse actions themselves did not occur until after the meeting on November 8, 1991. This lapse of time was too long to create, by itself, an inference of causality. *Breeden*, 532 U.S. at 273–74, 121 S.Ct. at 1511, 149 L.Ed.2d at 515. But here, the change in Brooks' duties requiring her to ask for permission for any and all absences from her desk occurred very close in time with a scheduled visit by the Human Rights Commission officer assigned to investigate Brooks' discrimination complaint. Additionally, the restriction was on its face punitive in nature in that it singled Brooks out for different treatment. Finally, there was the additional testimony that her break time was arbitrarily reduced from fifteen to ten minutes immediately after Sisk was served with Brooks' federal discrimination and retaliation complaint. This evidence of a causal connection was sufficient to survive the Housing Authority's motion for directed verdict. *See, e.g., Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 365–66 (6th Cir.2001). (The appellant, who was terminated one year after filing an EEOC complaint and three months after filing additional complaints, established a genuine issue of material fact on the issue of the causal connection element of a retaliation claim where there was other evidence of discrimination, including subjecting the ap-

pellant to disproportionate discipline for a minor infraction.)

Therefore, we hold that the trial court did not err in denying the Housing Authority motion for directed verdict on Brooks' retaliation claim.

## IV. After–Acquired Evidence

### A. Facts

After Brooks filed suit, the Housing Authority discovered that Brooks had made a number of misrepresentations on her resume concerning her educational background and achievement ("after-acquired evidence"). These included rounding up her GPA to 3.0 from 2.8, and a claim that she had a bachelor's degree in business administration when, in fact, she had completed only a certain number of hours toward that degree. Based on these misrepresentations and others, the Housing Authority moved for summary judgment on grounds that these misrepresentations alone—had it been aware of them at the time—would have excluded Brooks from consideration for being hired for the assistant manager position or promotion to that position.

Relying on *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), the trial court denied the summary judgment motion, but precluded Brooks from seeking the remedies of reinstatement and front pay. Also, at a later date, on the basis of the same ruling, the trial court refused to submit Brooks' constructive discharge claim to the jury, which we will treat as a directed verdict on the issue in the Housing Authority's favor.

On appeal, Brooks argues that the trial court failed to place the burden of proof on the Housing Authority and, therefore, misapplied *McKennon*. While we agree, we conclude that Brooks has failed to show how this error entitles her to any relief.

### B. Discussion

The after-acquired-evidence doctrine concerns the effect of evidence of employee misrepresentations occurring during the hiring or promotion process or evidence of employee misconduct that occurs during employment, that comes to light during the discovery process after the employee has filed suit. While most jurisdictions have addressed this question, the results have been far from uniform. Resolutions range from a complete bar to recovery to precluding the defendant from using it as a defense. Stephen J. Humes, Annotation, *After–Acquired Evidence of Employee's Misconduct as Barring or Limiting Recovery in Action for Wrongful Discharge*, 34 A.L.R.5th 699 § 2(a), 1995 WL 900314 (1995). The U.S. Supreme Court resolved a split among federal circuit court of appeals on the issue in *McKennon, supra.*

In *McKennon*, the Court began its discussion by eschewing the general rule that a plaintiff's "unclean hands" acts as a complete bar to recovery because of the important public purpose served by private discrimination suits. *McKennon*, 513 U.S. at 360, 115 S.Ct. at 885–86, 130 L.Ed.2d at 862–63. In other words, the Court rejected the approach that after-acquired evidence acted as a complete bar to recovery. On the other hand, the Court concluded that employee misconduct or misrepresentation was still relevant to the issue of remedy and held "that as a general rule in cases of this type, neither reinstatement nor front pay is an appropriate remedy." *Id.* at 361–62, 115 S.Ct. at 886, 130 L.Ed.2d at 863. We cited *McKennon* with approval in *Toyota Motor Mfg., U.S.A., Inc. v. Epperson*, Ky., 945 S.W.2d 413, 416 (1996), and now hold that it strikes the proper balance between the public's legitimate interest in vindicating unlawful acts of discrimination and the employer's equi-

table interests arising from an employee's wrongdoing.

■■■■ Reinstatement is an equitable remedy. *Slayton v. Ohio Dept. of Youth Services*, 206 F.3d 669, 680 (6th Cir.2000). In essence, reinstatement functions as an injunction issued by the trial court that orders the defendant-employer to rehire the plaintiff-employee after she has prevailed in an unlawful discrimination case under the KCRA. Thus, the power to order reinstatement appears to fall within the trial court's power to "enjoin further violations" under KRS 344.450.[2] In the context of this case, this means that the decision whether to order reinstatement is an issue for the trial court and not the jury. *See Steelvest, Inc. v. Scansteel Service Center Inc.*, Ky., 908 S.W.2d 104, 108 (1995). This is true for an award of front pay as well, *Schwartz v. Gregori*, 45 F.3d 1017, 1023 (6th Cir.1995), *cert. denied*, 516 U.S. 819, 116 S.Ct. 77, 133 L.Ed.2d 36 (1995), because "front pay" is "money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846, 121 S.Ct. 1946, 1948, 150 L.Ed.2d 62, 66 (2001). In other words, front pay either supplements the equitable remedy of reinstatement or acts as a substitute for it, though reinstatement remains the preferable remedy. *Schwartz*, 45 F.3d at 1023. Thus, the trial "court rather than the jury should determine whether an award of front pay is appropriate, and if so, the amount of the award." *Reneau v. Wayne Griffin & Sons, Inc.*, 945 F.2d 869, 870 (5th Cir.1991). Consequently, the decision whether reinstatement or front pay is precluded by a defendant-employer's after-acquired-evidence defense

is also to be made by the trial court, and the trial court's decision is reviewed under the abuse of discretion standard. *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1155 (11th Cir.2002).

■■■■ Under *McKennon*, "[w]here an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *McKennon*, 513 U.S. at 362–63, 115 S.Ct. at 886–87, 130 L.Ed.2d at 864. To be allowed to use the after-acquired-evidence defense, the defendant-employer must show by a preponderance of the evidence that "the after-acquired evidence would have led to her termination" or, in this case, would have precluded Brooks from being hired or promoted to assistant housing manager. *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1047–48 (7th Cir.1999); *see also O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 761 (9th Cir.1996) (citing cases); *Jones v. Board of Trustees of Community College District No. 508*, 75 F.Supp.2d 885, 888 (N.D.Ill.1999). In the case at bar, the trial court did not evaluate the Housing Authority's evidence of its after-acquired-evidence defense under this standard. That is, the trial court misapplied the law.

In its order denying Brooks the remedies of reinstatement and front pay, the trial court stated in a footnote:

The Court refuses to embroil itself in the semantics of determining exactly what misrepresentations were made, the extent of such misrepresentations, and the Defendant's prior knowledge of the misrepresentations. It suffices to say,

**2.** Neither party raises the issue of whether reinstatement and front pay are available remedies under KRS 344.450. Further, no

Kentucky case specifically addresses the issue. For the purposes of this opinion, we assume that the remedies are available.

misrepresentations were made by the Plaintiff.

The trial court gave no other reason for its decision. Thus, the trial court decided the issue without first making a finding—under the preponderance-of-evidence standard—as to whether the Housing Authority would have terminated, not hired or promoted, Brooks had it been aware of her misrepresentations. This oversight is of no consequence in relation to Brooks' discrimination claims because the jury found against her on those claims. Nor is it of any consequence to Brooks' retaliation claims because those claims do not include a discharge from employment or a failure to promote as adverse employment actions. But the trial court's ruling is of great consequence to Brooks' constructive discharge claim.

■■■ Constructive discharge presents a question of fact that, in jury trials, should be decided by the jury and not the trial court. *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir.1987); *see also, Steelvest*, 908 S.W.2d at 108. Thus, the Housing Authority's after-acquired-evidence defense had no bearing on whether the jury should have been instructed on the issue of Brooks' constructive discharge claim. Rather, the defense was evidence for the jury to weigh in deciding for itself whether Brooks had proved her case by a preponderance of the evidence. The trial court clearly erred in granting the Housing Authority a directed verdict on Brooks' constructive discharge claim based on its evaluation of the Housing Authority's after-acquired evidence. Instead, the trial court should have decided Brooks' constructive discharge claim under traditional directed verdict principles. So, we now turn to the question of whether Brooks presented sufficient evidence to survive the Housing Authority's motion for a directed verdict on her constructive discharge claim.

■■■ "The commonly accepted standard for constructive discharge is whether, based upon objective criteria, the conditions created by the employer's action are so intolerable that a reasonable person would feel compelled to resign." *Northeast Health Management, Inc. v. Cotton*, Ky.App., 56 S.W.3d 440, 445 (2001) (internal quotation marks omitted). Viewing the evidence introduced at trial in the light most favorable to Brooks, we conclude that she failed to produce evidence of constructive discharge upon which reasonable jurors could find for her under the above standard.

■■■ First, we note that, while constructive discharge may constitute an adverse employment action within the meaning of the KCRA, not all adverse employment actions constitute constructive discharge. *See, e.g., Meyers v. Nebraska Health and Human Services*, 324 F.3d 655, 659–61 (8th Cir.2003). Thus, the fact that Brooks introduced sufficient evidence of adverse action to support her retaliation claim does not foreclose inquiry into the question of whether she introduced sufficient evidence to support her constructive discharge claim. On appeal, she points to no other evidence to support her constructive discharge claim;[3] therefore, we must determine whether the evidence of being restricted to her desk and having her break time reduced

---

3. Brooks also argues that she was required to work in the maintenance warehouse, which was not in her job description and was not required of other employees with the same job title. She does not, however, cite to the record in support of this claim. We, therefore, decline to consider its impact, if any, on this discussion. *Elwell v. Stone*, Ky.App., 799 S.W.2d 46, 47 (1990); CR 76.12(4)(c)(iv).

by five minutes was sufficient to support the claim.

■ "A finding of constructive discharge requires an inquiry into both the objective feelings of an employee, and the intent of the employer." *Ford v. General Motors Corp.*, 305 F.3d at 554 (internal quotation marks omitted). The latter requires the plaintiff to show "that the employer intended and could reasonably have foreseen the impact of its conduct on the employee." *Id.* Under this objective standard, the restrictions the Housing Authority placed on Brooks leaving her desk undoubtedly would make a reasonable employee in Brooks' situation feel somewhat humiliated, irritated, and frustrated by the burden. Further, a reasonable employee certainly would feel that being singled out for a reduction in break time, without explanation or cause, was unreasonable and unfair. While these conditions might well lead the reasonable employee in Brooks' situation to look for other employment, the conditions were not intolerable; they would not *compel* resignation.

The changes in Brooks' working conditions were not made a public issue among her co-workers. While Brooks argues that she subjectively felt shunned and ridiculed by other employees because of these restrictions, she presented no objective evidence that this was so or even that this was commonly known among her co-workers. In fact, she testified that Feng felt sorry for her and sympathized with her. Further, there was no evidence that the trip to Feng's desk to ask permission to leave her desk was unduly difficult or burdensome, *i.e.*, that the trip was long, circuitous, etc. Finally, there was no evidence to show that, through these actions, the Housing Authority intended and foresaw that Brooks would resign as a result. Therefore, we hold that, while relying on the wrong grounds, the trial court nonetheless correctly granted the Housing Authority's motion for a directed verdict on Brooks' constructive discharge claim.

## V. Individual Liability

■ Brooks argues that the trial court erred in dismissing her retaliation claims against the three individuals allegedly responsible for retaliating against her. The basis of this argument is that KRS 344.280 states in pertinent part that "[I]t shall be an unlawful practice for a *person*, or for two (2) or more *persons* to ... retaliate ..." (emphasis added). In turn, "person" is defined in the KCRA to include "one (1) or more individuals." KRS 344.010(1). Thus, a persuasive argument is made that individuals can be held liable for unlawful retaliation under KRS 344.280. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 794 (6th Cir.2000) (holding that individuals can be held liable under KRS 344.280 and noting the difference in language between the KCRA and Title VII). But the issue is moot.

Brooks has a judgment against the Housing Authority for her unlawful retaliation claims, which we are instructing the trial court to reinstate. She cannot retry the issue against the agents for whom the principal—their employer, the Housing Authority—has already been found liable. Therefore, there is no relief we can grant Brooks on this issue.

## VI. Punitive Damages

■ Brooks argues that the trial court erred in failing to instruct the jury on punitive damages. Subsequent to the briefing of this case, we held that punitive damages are not an available remedy under KRS 344.450 in *Kentucky Dept. of Corrections v. McCullough*, Ky., 123 S.W.3d 130 (2003). Therefore, we hold that the trial court correctly decided the issue.

## VII. Instructions

▇▇ Brooks argues that the trial court erred in failing to instruct the jury according to the three-stage, burden-shifting format articulated in *Kentucky Center for the Arts v. Handley, supra.* In essence, she argues that the jury should have been instructed to weigh each party's burden of production in turn. No authority is cited for this argument and it is contrary to Kentucky law. *See Meyers v. Chapman Printing, Inc.,* 840 S.W.2d at 824. ("In Kentucky jury instructions do not include evidentiary presumptions.") There was no error.

## VIII. Attorney Fees

▇▇ Finally, Brooks argues that the trial court erred in setting the attorney fee award at $150.00 per hour. According to Brooks, she put into evidence that $200.00 per hour was a reasonable fee, and the Housing Authority failed to put into evidence anything to show that this was not a reasonable amount. Thus, she argues that the trial court abused its discretion in setting the hourly fee at $150.00 per hour because there was no evidentiary basis in the record to set it at the lower amount. This argument is not well taken.

KRS 344.450 provides:

Any person injured by any act in violation of the provisions of this chapter shall have a civil cause of action in Circuit Court to enjoin further violations, and to recover the actual damages sustained, together with the costs of the law suit. *The court's order or judgment shall include a reasonable fee for the plaintiff's attorney of record* and any other remedies contained in this chapter.

(Emphasis added). Thus, the issue is not whether the trial court had sufficient evidence before it to set the amount of Brooks' attorney's fee, but rather, whether the fee set by the trial court was reasonable. Because Brooks has made no argument on appeal that the $150.00 per hour is not a reasonable fee, there is no issue for us to decide.

## CONCLUSION

In view of the foregoing, we affirm the Court of Appeals' holding that the trial court correctly denied Brooks' motion for a directed verdict on her discrimination claims, affirm its holding that the trial court correctly granted the Housing Authority's motion for a directed verdict on Brooks' constructive discharge claim, and affirm its holding that the trial court did not abuse its discretion in its award of attorney fees. We reverse the Court of Appeals' holding that the trial court erred in denying the Housing Authority's motion for a directed verdict on Brooks' retaliation claim. Consequently, we remand this case to the Fayette Circuit Court to reinstate the judgments in Brooks' favor.

WINTERSHEIMER, J., concurs.

LAMBERT, C.J., concurs as to Parts I, II, IV, V, VI, VII, and VIII, and dissents as to Part III by separate opinion, in which he is joined by GRAVES and COOPER, JJ.

COOPER, J., dissents by separate opinion, in which GRAVES, J., joins as to Part I.

GRAVES, J., concurs as to Parts II, IV, V, VI, VII, and VIII, joins the dissent of COOPER, J., as to Part I, and joins the dissent of LAMBERT, C.J., as to Part III.

KELLER, J., concurs as to Parts I(A), I(B)(ii & iii), IV, VI, VII, and VIII and, by separate opinion in which he is joined in part by STUMBO, J., writes separately as to Part II, and concurs in result only as to Parts I(B)(i), III, and V.

STUMBO, J., concurs as to Parts I, IV, VI, VII, and VIII, concurs in result only as to Parts III and V, and joins the separate concurring opinion of KELLER, J., in part as to the analysis of Parts II, III, and IV.

KELLER, Justice, concurring.

I join the plurality opinion as to Parts I(A), I(B)(ii & iii), IV, VI, VII and VIII. I agree with the ultimate result reached in the opinion, but I concur in result only as to Parts I(B)(i) (because Brooks raised no objection to the inadmissible habit evidence), III, and V. I write separately to express in more depth my views as to (1) Part II, which I do not join—and would dissent from if it were a holding instead of merely analysis ancillary to the opinion's Part III holding—because I disagree with the plurality opinion's interpretation of KRS 344.280(1), and (2) Part V, because I would squarely address Appellant's argument that the trial court erroneously dismissed her retaliation claims against the individual defendants, Appellees Simms, Burch, and DeSpain.

In my view, the plurality opinion's conclusion that "as part of her *prima facie* case of retaliation, Brooks had to show that she suffered an 'adverse employment action' as that term is defined under federal law"[1] erroneously construes Kentucky's anti-retaliation statute in lockstep with its federal counterpart despite substantive differences between the statutes. By ignoring these differences, today's opinion unnecessarily dilutes the scope of KRS 344.280(1), by which the General Assembly intended to provide greater civil rights protection than is available under federal law. In Part II(B), the plurality opinion states that the scope of retaliation liability

under KRS 344.280(1) is coextensive with liability for acts of discrimination prohibited by Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3. As I wrote when this Court last considered an interpretive issue relating to KRS 344.280(1), any "policy considerations" that would favor harmonizing KRS 344.280(1) with federal law are eclipsed by the fact that Kentucky's anti-retaliation provision addresses itself to a broader class of potential actors and prohibits a broader range of conduct than federal law does:

> [A]lthough this Court has stated that, because of the overlapping policy goals, federal authority "offers some guidance" to Kentucky Courts faced with interpretive questions, ... reliance upon federal authority in this instance ignores substantive differences between the Kentucky and federal statutes. Kentucky's anti-retaliation provision, KRS 344.280(1), explicitly makes it unlawful for any person "[t]o retaliate or discriminate *in any manner* against a person ... because he has made a charge under this chapter." The Kentucky provision is thus broader than the one contained in Title VII of the 1963 Civil Rights Act because: (1) the Kentucky provision applies to all persons instead of merely employers and labor organizations; and (2) the Kentucky provision condemns any retaliatory act instead of merely acts of discrimination.[2]

A close examination of the plurality opinion's analysis on this issue reveals that it overlooks critical prohibitory language in KRS 344.280(1). The opinion reasons:

> Brooks' argument on interpretation depends with the difference between the

---

1. *Brooks v. Lexington–Fayette Urban County Housing Authority*, Ky., 132 S.W.3d 802 (2004).

2. *Bank One, Kentucky, N.A. v. Murphy*, Ky., 52 S.W.3d 540, 552 (2001) (Keller, J., concurring in part and dissenting in part) (footnotes omitted).

federal statute and the state statute. While KRS 344.280 makes it unlawful for one or more persons to "discriminate *in any manner* against a person" (emphasis added), 42 U.S.C. § 2000e–3 makes it unlawful for an "employer to discriminate against any of his employees or applicants for employment." Thus, the question arises whether to "discriminate in any manner" is broader in scope than "discriminate against." We conclude that there are no meaningful distinctions between the two standards.[3]

This analysis either overlooks or ignores the fact that KRS 344.280(1) contains prohibitory language other than "discriminate," namely the verb "to retaliate," which is separated from "discriminate" by the disjunctive "or." Thus, the appropriate question is not whether "discriminate in any manner" is broader than "discriminate against," but whether, by making it unlawful for persons to "retaliate or discriminate in any manner," KRS 344.280(1) prohibits retaliatory acts in addition to "discriminat[ing] against" an employee.

In my view, KRS 344.280(1) is unquestionably broader in scope than Title VII's anti-retaliation provision. Perhaps the clearest reason to interpret "to retaliate"

as having significance distinct from "discriminate" is the fact that the Kentucky General Assembly utilized two (2) verbs rather than one (1) when it wrote the statute.[4] The fact that KRS 344.280 "plainly permits the imposition of liability on individuals,"[5] however, helps to explain further the purpose for the "to retaliate" language. By making unlawful any act of retaliation or discrimination committed by "a person ... or two or more persons" acting as part of a conspiracy,[6] KRS 344.280(1) diverges from federal law[7] and offers protection from retaliation over and above both Title VII and KRS 344.040, which "afford[ ] protection from discrimination only to those in an employer-employee relationship."[8] As such, KRS 344.280(1) encompasses all acts of vengeance taken in response to KRS Chapter 344 claims—even when the act taken would not constitute a prohibited act of discrimination.

Accordingly, *Kentucky Center for the Arts v. Handley*[9] correctly recognized the significance of KRS 344.280(1)'s "to retaliate or discriminate in any manner" language when it outlined the elements of a retaliation plaintiff's prima facie case.[10] And, I vote to reverse the Court of Ap-

---

**3.** *Brooks,* 132 S.W.3d at 801 (emphasis in original).

**4.** *See TRW Inc. v. Andrews,* 534 U.S. 19, 31, 122 S.Ct. 441, 449, 151 L.Ed.2d 339 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' ").

**5.** *Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 794 (6th Cir.2000).

**6.** KRS 344.280.

**7.** *Morris,* 201 F.3d at 794 ("This section does not 'mirror' 42 U.S.C. § 2000e–3(a), the analogous retaliation provision of Title VII, which

forbids retaliation by 'an employer.' Rather, § 344.280 forbids retaliation by 'a person.' ").

**8.** *Bank One,* 52 S.W.3d at 547 n. 2 (Keller, J., concurring in part and dissenting in part).

**9.** Ky.App., 827 S.W.2d 697 (1991).

**10.** I would note that, although today's plurality opinion disregards *Handley*'s articulation of a prima facie case for retaliation, this Court evaluated a sufficiency of the evidence issue pursuant to *Handley* in our most recent opinion in an employment discrimination case, which was rendered in August of 2003. *See Kentucky Department of Corrections v. McCullough,* Ky., 123 S.W.3d 130, 133–34 (2003).

peals and to reinstate the jury's verdict in favor of Brooks on her retaliation claim, because the trial court correctly denied the Housing Authority's motion for a directed verdict after Brooks sufficiently proved that she had suffered "disadvantageous acts" in retaliation for her Kentucky Civil Rights ("KCRA") claim.

By adopting Title VII's "adverse employment action" requirement, today's opinion accomplishes its objective of interpreting KRS 344.280(1) in accordance with federal law. By doing so, however, the plurality opinion ignores significant statutory differences and, by importing a requirement developed in connection with a narrower retaliation statute, "waters down" KRS 344.280(1) and sows the seeds of future headaches. For instance, how will the federal "adverse employment action" requirement affect retaliation claims brought under KRS 344.280(1) against individual non-employer/non-coworker persons, *i.e.*, persons who, under Kentucky's anti-retaliation statute, are prohibited from retaliating or discriminating "in any manner," but are unlikely to be in a position to take "adverse employment actions" against a plaintiff? I fear that today's opinion constitutes a "judicial rollback" of the strong position that Kentucky has taken in support of the free exercise of rights guar-

anteed by the KCRA through its enactment of KRS 344.280(1), which is designed to prohibit any act in retaliation for the exercise of a person's rights under the Act.

Additionally, I write separately as to Part IV because the plurality opinion does not adequately address the issue presented, *i.e.*, whether individuals can be held liable for unlawful retaliation. Although it characterizes Brooks's allegation as "a persuasive argument" and references the unequivocal KRS 344.010(1) definition of "person," the plurality opinion bypasses the issue of individual liability by holding that Brooks's judgment against the Housing Authority renders moot the question of whether the trial court properly dismissed her claims against Appellees Simms, Burch, and DeSpain. While I would agree that the issue is essentially moot because, as long as the Housing Authority satisfies the judgment, Appellant will have been fully compensated for her injuries,[11] I find Brooks's argument more than merely "persuasive," and I would hold that the trial court erred when it dismissed her claims against the individual defendants.[12] Although the Housing Authority could be—and was, by the jury's verdict—held vicariously liable for the conduct of its employees,[13] it is long-standing, black-let-

11. RESTATEMENT (SECOND) OF JUDGMENTS § 50(2) (1980) ("Any consideration received by the judgment creditor in payment of the judgment debtor's obligation discharges, to the extent of the amount of value received, the liability to the judgment creditor of all other persons liable for the loss."). *Id.* cmt. d.

12. *See Palmer v. Intern. Ass'n of Machinists,* Ky., 882 S.W.2d 117, 120 (1994) (reversing summary judgment and remanding KRS 344.280 retaliation claim against two individual, non-employer defendants).

13. *Cf. American General Life & Acc. Ins. v. Hall,* Ky., 74 S.W.3d 688, 692 (2002) (observing that statutory civil rights actions represent an exception to the general rule that "an

employer is not vicariously liable for an intentional tort of an employee not actuated by a purpose to serve the employer[.]"). *But see Degener v. Hall Contracting Corp.,* Ky., 27 S.W.3d 775, 788–89 (2000) (Keller, J., dissenting) (opining that KRS 344.040 "hold[s] employers, and only employers, *directly liable* for sexual discrimination in the workplace." (emphasis added)). In the context of KRS 344.280, which extends liability to "any person," however, an employer may be held either directly liable for its own acts of retaliation, *see Mountain Clay v. Com'n on Human Rights,* Ky.App., 830 S.W.2d 395 (1992) or vicariously liable for the retaliatory acts of employees, as occurred in this case.

ter law that a principal and an agent are, under normal circumstances, jointly liable for the agent's actions.[14] Accordingly, the fact that the Housing Authority could have been vicariously liable was irrelevant to the separate question of whether Appellees Simms, Burch, and DeSpain were individually liable for acts of retaliation prohibited by KRS 344.280(1). In my view, the trial court should have permitted Brooks to pursue her retaliation claims against the defendants collectively.

STUMBO, J., joins in part as to the analysis of Parts II, III, and IV.

LAMBERT, Chief Justice, dissenting.

I respectfully dissent from the majority opinion with respect to Appellant's claim of retaliation. In my view, Appellant failed to present sufficient evidence to establish a *prima facie* case.

The pertinent facts of this case deal with the Housing Authority's actions following Brooks' initiation of a discrimination suit. Brooks alleged that during a meeting with a supervisor she was "slapped at" by that supervisor but without physical contact. Following the meeting, she was required to request permission from her immediate supervisor to leave her desk for any reason. Additionally, Brooks claimed that her breaks were arbitrarily shortened from fifteen to ten minutes. Finally, she alleged that the Housing Authority unfairly required her to work in a warehouse, even though she had previously worked there prior to her discrimination suit.

The Court of Appeals was correct in determining that Brooks' complaints regarding the activities of the Housing Authority "do not rise to the level of adverse employment action." It also correctly held that "Brooks had failed to make a *prima facie* showing of retaliation."

The majority is correct that there is no meaningful distinction between KRS 342.280 and its federal counterpart 42 U.S.C. § 2000e–3. Since Kentucky law and federal law are substantially similar, it follows that we may rely on federal case law for guidance in applying the Kentucky Act.[1]

In *Hollins v. Atlantic Company, Inc.*,[2] an employment discrimination and retaliation case, the employer enforced its personal grooming policy on an employee by requiring her to receive permission for hairstyle changes. The *Hollins* court explained the requirements for determining whether an employer's actions constitute an adverse employment action:

[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary,

---

14. *See Aetna Life Ins. Co. v. Roper,* 243 Ky., 811, 50 S.W.2d 8, 9 (1932) ("[A] master and servant may be jointly liable to a third party for a negligent act of the servant[.]"); *New Ellerslie Fishing Club v. Stewart,* 123 Ky. 8, 93 S.W. 598, 599 (1906) ("[I]t is now well settled that a joint action may be prosecuted against the servant and master, or the corporation and its employé, for a tort of the servant or agent whilst acting within the scope of his employment."); *Illinois Cent. R. Co. v. Coley,* 121 Ky. 385, 89 S.W. 234, 237 (1905) ("[W]e see no reason why the principal and the agent may not be sued jointly for the wrong done by the agent in the course of his agency. Any other rule would do injustice, as it would require the plaintiff to prosecute two actions, or force him to elect between wrongdoers as to which he would sue.").

1. *See Meyers v. Chapman Printing Co.,* Ky., 840 S.W.2d 814 (1992).

2. 188 F.3d 652 (6th Cir.1999).

a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.[3]

In *Hollins,* the court held that the employee did not establish a *prima facie* case and that "lowered performance rating, standing alone" did not result in an adequate showing for an adverse employment action.[4] Thus, an employer must engage in a substantial activity that has a materially adverse effect on employment. The United States Court of Appeals for the Third Circuit properly described the standard:

> Retaliatory conduct other than discharge or refusal to rehire is thus proscribed by Title VII only if it alters the employee's "compensation, terms, conditions, or privileges of employment," deprives him or her of "employment opportunities," or "adversely affect[s] his [or her] status as an employee." It follows that "not everything that makes an employee unhappy" qualifies as retaliation, for "[o]therwise, minor and even trivial employment action that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.' "[5]

Brooks' supervisor, the offender, engaged in rude, mean-spirited, generally obnoxious conduct toward her. Perhaps his conduct was such as to merit employment sanctions against him. However, his bad conduct did not meet the legal standards described hereinabove. Brooks was not subjected to materially adverse changes in her employment as required by prevailing law. The *Robinson* court warned that too broad an interpretation of Title VII could lead to a circumstance where "irritable, chip-on-the-shoulder employee[s]" could too easily state a claim for discrimination or retaliation based on minor irritants that inevitably occur in the workplace. I fear this Court has set the bar so low that employers will be severely limited in their ability to manage their businesses for fear of claims such as this.

COOPER and GRAVES, JJ., join this dissenting opinion.

COOPER, Justice, dissenting.

Federal Rule of Evidence (FRE) 406 provides:

> *Evidence of the habit of a person or of the routine practice of an organization,* whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

(Emphasis added.)

For at least one hundred years, the common law rule in Kentucky has been that such evidence is inadmissible. *Burchett v. Commonwealth,* Ky., 98 S.W.3d 492, 494–95 (2003). The Committee that drafted the proposed Kentucky Rules of Evidence recommended departure from the common law rule and adoption of a proposed rule identical to FRE 406. Evidence Rules Study Committee, Final Draft, at 29–30 (1989). The rule was approved by the 1990 General Assembly subject to the approval of the Supreme Court of Kentucky. KRS 422A.0406 (1990 Ky. Acts, ch. 88, §§ 16, 93). Unfortunately, the 1991 Kentucky Supreme Court disapproved of proposed KRE 406, and the 1992

---

**3.** *Id.* at 662 (*quoting Crady v. Liberty Nat'l Bank & Trust Co. of Indiana,* 993 F.2d 132, 136 (7th Cir.1993)).

**4.** *Id.*

**5.** *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1300 (3rd Cir.1997) (citations omitted).

General Assembly accordingly repealed KRS 422A.0406 (1992 Ky. Acts, ch. 324, § 30). Thus, evidence that is admissible in all federal courts under FRE 406 and admissible in all of the other forty-nine states by statute, rule, or common law, *Burchett,* at 506–08 (Cooper, J., dissenting), remains inadmissible in Kentucky. *Id.* at 496–98 (plurality opinion) (all evidence of habit or routine practice, while relevant under KRE 401 and otherwise admissible under KRE 402, is always excluded by KRE 403); *id.* at 499–502 (Keller, J., concurring) (Supreme Court's rejection of proposed KRE 406 precludes admission under KRE 402).

*Burchett* is less than a year old. Yet, today's lead opinion states:

> To state the obvious, an employer necessarily must hire and sometimes fire employees. Employers being human, over time the individual and specific reasons for making these decisions fade from memory. Thus, to make failure to remember the reason for any particular employment decision fatal to a defense to a discrimination claim would place an *intolerable burden* on employers to document the reason for every employment decision as insurance against future lawsuits. *Therefore, we hold that, where an employer claims that the actual reason cannot be recalled, the employer may rely on normal business practices* and exemplary reasons consistent with those practices when called upon under the *McDonnell Douglas* framework [to produce] a non-discriminatory reason to rebut a plaintiff's *prima facie* case of discrimination.

*Ante,* at 799 (emphasis added).

Of course, the only reason for admitting evidence of "the habit of a person or the routine practice of an organization," FRE 406, is that the witness, as here, cannot remember what action was actually taken or the reason therefor on the occasion in question ("the actual reason cannot be recalled," *ante,* at 799) and is forced to rely on the witness's own habits or the routine practice of the witness's organization to fill that gap. Of course, I agree that this evidence is relevant and, thus, admissible under KRE 402 ("All relevant evidence is admissible, except as otherwise provided by the Constitutions of the United States and the Commonwealth of Kentucky, by these rules, or by other rules adopted by the Supreme Court of Kentucky."). *See Burchett, supra,* at 502–13 (Cooper, J., dissenting).

The lead opinion's reliance on *Major v. Bishop,* 462 F.2d 1277 (10th Cir.1972), and *Muncie Aviation Corp. v. Party Doll Fleet, Inc.,* 519 F.2d 1178 (5th Cir.1975), is curious at best. Both cases were decided under common law principles that existed prior to the 1975 adoption of the Federal Rules of Evidence. And because they are both federal cases, they would be decided the same way today under FRE 406. The lead opinion's citation to *Martin v. Ben P. Eubank Lumber Co.,* Ky., 395 S.W.2d 385 (1965), is even more misplaced. That case was governed by the Uniform Commercial Code which specifically defines "course of dealing" and "usage of trade," KRS 355.1–205, and permits evidence of such to prove the existence, and terms of, and modifications to contracts of sale or lease under certain specified circumstances. *See* KRS 355.2–202(a); KRS 355.2–208(1); KRS 355.2–314(3); KRS 355.2–504(b); KRS 355.2–723(2); KRS 355.2A–202(1); KRS 355.2A–207(1); KRS 355.2A–212(3); KRS 355.2A–214(3)(c); KRS 355.2A–507(2). Manifestly, the provisions of the Uniform Commercial Code have nothing to do with the case *sub judice.* Finally, the relevance of *Bass v. Williams,* Ky.App., 839 S.W.2d 559 (1992), escapes me. *Bass* specifically held that the proffered evidence of custom

and usage to prove standard of care was properly excluded, *id.* at 565, and cited no case in which such evidence had ever been admitted to prove a standard of care (but only speculated that it might be admissible under some unspecified circumstances). *Id.* Of course, the evidence in question here is deemed admissible by the lead opinion not to prove a commercial contract or a standard of care but to prove conforming conduct on another occasion, *i.e.,* habit evidence.

If *Burchett* is to be the law of this jurisdiction, it should be applied consistently and not on an ad hoc basis. (The habit evidence deemed inadmissible in *Burchett* was much more reliable than the habit evidence deemed admissible by the lead opinion in this case because the evidence in *Burchett* was self-inculpatory, and the habit evidence here was self-serving.) This Court should either adhere to *Burchett* or overrule it, or (at least) hold that the *McDonnell Douglas* framework was satisfied here solely because Appellant did not object to the introduction of otherwise inadmissible evidence of Appellee's routine business practices. Instead, the lead opinion resorts to childish characterization ("chicken little"?) in defense of unsound legal analysis.

GRAVES, J., joins this dissenting opinion.