RENDERED: APRIL 15, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-0560-MR

THOMAS LIGHTFOOT                                                     APPELLANT

APPEAL FROM FAYETTE CIRCUIT COURT
v.        HONORABLE ERNESTO M. SCORSONE, JUDGE
ACTION NO. 18-CI-02302

FORTERRA PRESSURE PIPE, INC.;
FORTERRA CONCRETE
INDUSTRIES, INC.; FORTERRA PIPE
& PRECAST, LLC; AND JOHN DOE                                        APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CALDWELL, COMBS, AND L. THOMPSON, JUDGES.

COMBS, JUDGE: Thomas Lightfoot appeals a summary judgment of the Fayette

Circuit Court dismissing his action for unlawful workplace discrimination brought

against his former employer, Forterra Concrete Industries, Inc., (Forterra

Concrete). While his notice of appeal also identifies Forterra Pipe & Precast, LLC,

and Forterra Pressure Pipe, Inc., as appellees, Lightfoot conceded before the trial

court that these business entities were not his employers, and he agreed to a dismissal of the action with respect to them. Consequently, we do not treat them as parties on appeal. Moreover, we regard as a mere oversight Lightfoot's misidentification of Forterra Pipe & Precast as *the only appellee* on the cover of his appellant's brief and the erroneous naming of Forterra Pressure Pipe, Inc., as *the only appellee* within the body of that brief. Finally, Lightfoot makes no claim of error with respect to the appellee identified as "John Doe." Consequently, we make no further comment with respect to him.

On appeal, Lightfoot argues that the trial court erred by granting summary judgment with respect to his claims of race discrimination, hostile work environment, and unlawful retaliation. After our review, we affirm.

Lightfoot, an African-American man, was hired by Sherman-Dixie Concrete Industries, Inc., (Sherman-Dixie), in June 2005. He was working as a maintenance technician earning an hourly wage when he was promoted to plant manager by Sherman-Dixie in June 2014. Lightfoot became a salaried employee and held the position as plant manager for four to five months. After that time, Bruce Stamper, plant manager at Sherman-Dixie's Hermitage, Tennessee, facility, transferred to the Lexington facility as plant manager. Lightfoot accepted the title of assistant plant manager and continued to be paid a salary rather than an hourly wage (as is typical for maintenance personnel).

However, his focus returned to maintenance and training employees to operate the production equipment.

At the time of his deposition, Stamper was working for Foley Products as operations manager. However, he remembered that Sherman-Dixie's Lexington plant was in such bad shape when he arrived in Lexington that he worked eighteen-hour days to sort out the production issues. Stamper indicated that upon his arrival to the Lexington plant, Lightfoot explained to him that Sherman-Dixie had not given him a fair opportunity to run the facility. Stamper testified that Lightfoot "wasn't giving me the full effort" because he (Lightfoot) was embittered by the personnel decision. Stamper experienced a number of performance issues with Lightfoot. He indicated that Lightfoot had been "pencil-whipping some paperwork that things had been done when they really weren't done"; told a lie that cost the plant two and one-half days' production and massive expenses when he allowed cement to harden in a mixer; took an inordinate amount of time to repair machines; failed to address safety issues on a timely basis; and was so disorganized as to be ineffective at his job duties.

In January 2016, Sherman-Dixie was acquired by Forterra Concrete. Several months later, Stamper was promoted to area operations manager. In August 2016, Stamper promoted Casey Edmonson, a machine operator, to be Lexington's plant manager. Stamper continued to be in the Lexington facility at

least two days per week, and he testified that once Edmonson was promoted, Lightfoot's work performance continued to deteriorate. Nevertheless, Lightfoot retained the title of assistant plant manager and continued to be paid a salary. He remained focused on maintenance and training employees.

In his deposition, Lightfoot testified that before Edmonson was promoted to plant manager, he (Edmonson) "started being more, I guess, argumentative towards me, refusing to listen to what I was asking him to do, and just more confrontational." Lightfoot also recalled that Edmonson made a "whip sound" either on his cellphone or with his mouth to encourage people to get going. He admitted that he had never heard the sound himself, but he had heard rumors. He explained that he had discussed this with Stamper, saying, "you know, I didn't actually witness it and I can't say something that I didn't actually witness. I can't -- I mean, I don't feel right just trying to add to something that I have no idea what I am adding to." He stated that fellow employees told him (Lightfoot) that they had approached Edmonson to explain that they regarded the sound as racist. Lightfoot could not recall whether Edmonson was still a machine operator or if he was transitioning into management at the time this sound was made.

Lightfoot indicated that during the year following Edmonson's promotion, Edmonson's "whole demeanor changed." Lightfoot testified that "there seemed like there was always incidents where I was getting blamed [by

Edmonson] for things that was [*sic*] getting broken." Lightfoot acknowledged that he had been issued five written reprimands related to his work performance between December 2016 and March 2017.

In May 2017, Lightfoot learned from a fellow employee that his (Lightfoot's) contact information in Edmonson's personal cellphone was designated by the "poop emoji"-- the ubiquitous swirl of chocolate, soft-serve ice cream with large eyes and a wide smile often used in electronic communication to designate bathroom topics, disappointment, or rejection. Lightfoot reported this information to Stamper. When Stamper asked Lightfoot how he felt about it, Lightfoot indicated that he was "very hurt, I feel very humiliated, and I feel like he [Edmonson] was being racist." When asked how the image was racist, Lightfoot explained that "of all the black employees in here, [Edmonson] shows it to a white employee and laughed about it." Lightfoot told Stamper that he wanted Edmonson terminated immediately because this behavior violated the company's code of conduct. Instead of termination, Edmonson was reprimanded by Stamper. Edmonson removed the emoji from Lightfoot's contact information and never used it again. Lightfoot stated that Stamper also asked Edmonson to apologize but that when Edmonson did so, it was a sarcastic apology.

Stephen Knotts became area operations manager for the region -- including Forterra Concrete's Lexington plant on September 1, 2017. He left the

company in December 2018. In his deposition, Knotts testified that "[i]t was obvious when I first got here" that Lightfoot lacked the "ability to do the maintenance" required at the plant. He explained that Lightfoot's failure to turn off the cement mixer for the weekend could have caused the complete loss of the facility through a fire and that destruction of critical machine parts resulting from his negligence had been costly to the company both in terms of their replacement costs and an extended period of lost production. Knotts indicated that he and Tim Jones, a senior operations manager, determined that a "complete lack of maintenance" was the single impediment to the Lexington plant's efficient operation.

In his deposition, Lightfoot also described a heated encounter between Edmonson and himself concerning Lightfoot's inability to repair a machine. Lightfoot admitted to Knotts that it was his (Lightfoot's) fault that the machine was down but stated to Knotts that "he [Edmonson] didn't have no [*sic*] right to come up in my face and point his finger at me." Lightfoot reported that Edmonson communicated through text with him thereafter and that they had no further verbal disagreements. He adamantly denied that there had ever been any physical violence between them.

Knotts explained that in October 2017, as Forterra Concrete was transferring employees' classification (job titles) from Sherman-Dixie to their own

system, he realized that there was no classification for Lightfoot as a salaried maintenance person. He confirmed to counsel that "there is typically not a salary maintenance guy." After he decided to convert Lightfoot to an hourly rate of pay, he asked a resource manager in an email "have you run any numbers on what we need to pay [Lightfoot] hourly compared to a salary?" It was confirmed that Lightfoot's earnings would **increase substantially** if he were re-classified as "Machine Operator II" and even more substantially if he were re-classified as "Maintenance I." Knotts indicated to the resource manager that he did not "think [Edmonson, the Lexington plant manager] wants him in Maintenance, so its sounds like a Machine Operator II might be the best option." He explained that machine operators are expected to do some of the maintenance on the equipment they operate and that "a position like this might be a good fit."

Knotts stated in his deposition that he had a meeting with Lightfoot on October 10, 2017, to explain to him that "we didn't want him in maintenance and we had a position we were wanting him to look at as a Machine Operator II." He asked Lightfoot to take a couple of days to consider the offer. According to Knotts, Lightfoot "didn't feel like that was a good step for him. He felt like he was going backwards. Even though the money was going forwards." Knotts indicated that Lightfoot was reassigned to operating and maintaining a wire draw machine and "still doing some light maintenance stuff that he could accomplish. . . ." By

mid-November 2017, the company had decided to eliminate Lightfoot's salaried maintenance position. Lightfoot was terminated days later. Thereafter, a man of color was hired in a classified, hourly-wage maintenance position with no management responsibilities.

On June 25, 2018, Lightfoot filed a civil action against Forterra Concrete alleging that he had been subjected to harassment, discrimination, retaliation, and disparate treatment based on his race in violation of Kentucky law. The circuit court granted summary judgment to Forterra Concrete. It concluded that Lightfoot's allegations concerning Edmonson's use of the "poop emoji" and his confrontational management style were insufficient to show unlawful workplace discrimination or a hostile work environment and that there was no evidence to support the allegation that Lightfoot suffered unlawful retaliation as a result of his complaint regarding the "poop emoji." The circuit court concluded that Forterra Concrete was entitled to judgment as a matter of law. This appeal followed.

Summary judgment is properly granted where "the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law." CR[1] 56.03. Upon our review, we must consider whether the trial court correctly determined that there were no genuine issues of material fact concerning Lightfoot's civil rights claim and properly concluded that Forterra Concrete was entitled to judgment as a matter of law. *See Scifres v. Kraft*, 916 S.W.2d 779 (Ky. App. 1996). Because summary judgment involves only questions of law and not the resolution of disputed material facts, we do not defer to the trial court's decision. *Goldsmith v. Allied Building Components, Inc.*, 833 S.W.2d 378 (Ky. 1992). Instead, we review the trial court's interpretations of law *de novo. Cumberland Valley Contrs., Inc. v. Bell County Coal Corp.*, 238 S.W.3d 644 (Ky. 2007).

The Kentucky Civil Rights Act makes it unlawful for an employer to discharge (or otherwise discriminate against) an employee based on race. KRS[2] 344.040(1)(a). Because Lightfoot's evidence is entirely circumstantial, the matter requires analysis under the burden-shifting framework established by the United States Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *Norton Healthcare, Inc. v. Disselkamp*, 600 S.W.3d 696 (Ky. 2020); *Jefferson County v. Zaring*, 91 S.W.3d 583 (Ky. 2002). Pursuant to this approach, an employee must first establish a *prima facie*

---

[1] Kentucky Rules of Civil Procedure.

[2] Kentucky Revised Statutes.

case of discrimination. *Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492 (Ky. 2005). The employee must show that: (1) he was a member of a protected class; (2) he was discharged or suffered an adverse employment action; (3) he was qualified for the position; and (4) he was replaced by a person outside of the protected class. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).

Where an employee establishes this initial case by fulfilling these criteria, a burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the employer does so, the burden then shifts back to the employee to prove intentional discrimination by showing that the employer's articulated reason was merely a pretext, masking its discriminatory motive. *Id.*

In his brief, Lightfoot identifies three types of adverse employment action upon which he bases his argument that Forterra Concrete discriminated against him because of race: (1) the multiple written reprimands prepared between December 2016 and March 2017; (2) a "piling on" of tasks engineered to persuade him to leave his job; and (3) his eventual termination. He presents the court with little in the way of argument. Nevertheless, we comment on each of these three claims.

Lightfoot, Edmonson, and Stamper offered extensive deposition testimony concerning the numerous, written reprimands issued to Lightfoot

-10-

between late December 2016 and mid-March 2017.  Lightfoot was written up in December 2016 for leaving a cement mixer operating unattended over a weekend. In his deposition, he explained that he had simply forgotten that he had turned it on.  Lightfoot admitted that he had been written up again in February 2017 for failing to adequately supervise a new operator -- resulting in the destruction of critical machine parts and the loss of production.  In his deposition, Lightfoot admitted that he had made a mistake "because I should have went ahead and double-checked."

Lightfoot acknowledged that he had been written up again on March 15, 2017.  In his deposition, he admitted that he had lied to Edmonson and Stamper about his ability to continue to work on a machine critical to production.  Lightfoot conceded that he had been written up on March 16, 2017, for failing to inspect and clean a cement silo bag that had been installed in January.  In his deposition, he admitted that he had not inspected or cleaned the equipment as directed and did not think it was necessary as the equipment was new.  Finally, Lightfoot conceded that he had been written up on March 17, 2017, for failing to perform necessary maintenance on a machine critical for production.  In his deposition, he explained that he had lacked the time and had forgotten to oil the machine per the manufacturer's recommendation.

Lightfoot's deposition testimony indicates that each of these written reprimands was issued with good cause. The nature of the reprimands suggests that Lightfoot was not qualified for his maintenance position with Forterra Concrete. Consequently, he could not establish a *prima facie* case of discrimination. Lightfoot's acknowledgment with respect to the reprimands and Forterra's explanations with respect to his dismissal indicate that Forterra Concrete had legitimate, nondiscriminatory reasons for the adverse employment action. *Id.* Lightfoot did not offer any proof that Forterra Concrete's articulated reason was merely a pretext disguising a discriminatory motive. The circuit court did not err by concluding that the employer was entitled to judgment as a matter of law with respect to this claim.

Next, Lightfoot argues that he was unlawfully subjected to a piling on of assignments designed to cause him to leave his position in maintenance. In his deposition, Lightfoot explained that from late September forward, he experienced "a lot of harassing things," including "a magical list that I was supposed to try to get done every day." In his deposition testimony, Knotts indicated that within a few weeks of onboarding with Forterra Concrete, he and Tim Jones decided that "we had to -- to come up with a plan to get the maintenance up to snuff to get that plant running like it is supposed to and being efficient." In an effort to achieve that goal, they consulted with a sister facility in Minnesota operating the same

-12-

equipment. When they returned to Lexington, Knotts began to implement an equipment maintenance schedule and protocol. While Lightfoot objected to this schedule, there is absolutely no indication that Forterra Concrete's decision to adopt a maintenance protocol was anything other than legitimate and nondiscriminatory business decision. There were no genuine issues of material fact, and the circuit court ruled accordingly. We perceive no error.

Next, Lightfoot contends that his dismissal was unlawfully discriminatory. Because Forterra Concrete offered a legitimate, nondiscriminatory reason for Lightfoot's discharge, the burden shifted back to Lightfoot to produce sufficient evidence from which a jury could reasonably reject the employer's explanation and conclude that the articulated reason was merely a pretext.

As recounted above, the undisputed facts indicate that Lightfoot made numerous maintenance errors that created safety risks, slowed production, and caused Forterra Concrete to incur costs to correct. Lightfoot was not meeting his employer's legitimate expectations. The conduct legitimately warranted his discharge. Moreover, he has failed to show that his termination was racially motivated instead of the result of the elimination of the salaried maintenance position as part of the ongoing reorganization of what was once Sherman-Dixie. Consequently, Forterra Concrete was entitled to judgment as a matter of law.

With respect to the separate allegation of error concerning his claim of a hostile work environment, Lightfoot argues that the circuit court "intentionally disregarded" the relevant circumstantial evidence he offered. He contends specifically that the trial court "devalued" evidence concerning the "whip sound" produced by Edmonson by observing that Lightfoot did not personally experience the sound and only heard rumors about it. He argues that the circuit court failed to consider that Edmonson had a volatile temper; that he told an employee that he hoped that Lightfoot would die in a fiery crash; and that he was the subject of complaints by other employees. He also points to "Forterra's blatant refusal to allow Lightfoot to file a formal complaint."

Kentucky's Civil Rights Act "is not intended to make all offensive conduct actionable." *Gray v. Kenton County*, 467 S.W.3d 801, 805 (Ky. App. 2014). In order to be actionable, the conduct must be "sufficiently severe or pervasive" so as to create a truly "abusive working environment," and the conduct must be "continuous and concerted in order to be deemed pervasive." *Ammerman v. Board of Educ. of Nicholas County*, 30 S.W.3d 793, 798 (Ky. 2000).

> Whether the harassment is severe and pervasive is determined by a totality of the circumstances test -- circumstances including frequency and severity of the conduct, whether the conduct is physically threatening or humiliating, and whether it unreasonably interferes with the employee's work performance.

-14-

*Gray*, 467 S.W.3d at 805 (citation omitted).  The harassment must be both objectively and subjectively offensive.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 371, 126 L. Ed. 2d 295 (1993).  The circuit court did not err by concluding that Lightfoot failed to establish a *prima facie* case with respect to this claim.

Lightfoot failed to establish that he was subject to harassment based on his race.  By his own testimony, Lightfoot admitted that he could not remember if the "whip sound" produced by Edmonson was made while he was a machine operator -- a point at which Edmonson was Lightfoot's subordinate and subject to Lightfoot's supervision -- rather than the other way round.  Moreover, the evidence indicated that the sound was used indiscriminately in the presence of both black and white employees.  Similarly, Edmonson's tendency to lash out in frustration when production slowed and his ugly comment hoping that Lightfoot would die bore no indication that the conduct was necessarily related to Lightfoot's race.  Nor was it pervasive or severe.  Lightfoot may have been subjectively offended by Edmonson's comments or conduct.  However, there was no indication that an objectively reasonable person would be so unsettled as to suffer in his work performance as a result.

With respect to the claims of two other employees alleging racial discrimination, the circuit court observed that one of those had been filed by

Jeremiah Mabson. While Mabson filed an internal complaint concerning Edmonson's conduct, he testified in his deposition that the complaint prompted a management change at Forterra Concrete with which he was satisfied. The other complaint was filed by Antonio Reed. Lightfoot himself testified that Reed's dismissal was not based on race. He indicated that Reed was terminated with good reason and that he should have been fired long before he was. The circuit court did not err by concluding that the complaints of Mabson and Reed were not helpful in its analysis of Lightfoot's discrimination claims.

Lightfoot also points to "Forterra's blatant refusal to allow Lightfoot to file a formal complaint." In his deposition, Lightfoot conceded that he understood from Forterra Concrete's human resources team that there was a strict code of conduct in place and that the company would not tolerate any kind of abuse or disrespect toward employees. He understood that he could report anything he regarded as abuse to his area operations manager. Lightfoot specifically agreed that Stamper believed he had dealt with the "poop emoji" issue to Lightfoot's satisfaction and admitted that he did not lodge a more formal complaint with the company concerning Stamper's resolution of the matter. There was no evidence to suggest that Forterra Concrete blatantly refused to permit Lightfoot to file any complaint. Forterra Concrete was entitled to judgment as a matter of law on this issue. There was no error.

Finally, in his last allegation of error, Lightfoot argues with respect to his claim of unlawful retaliation that the circuit court erred by requiring "temporal proximity" between his report concerning the "poop emoji" and his termination and by overlooking the fact that he complained to Knotts that Edmonson was still picking on him by directing his maintenance tasks just weeks before he was dismissed. We disagree.

KRS 344.280(1) makes it unlawful "[t]o retaliate or discriminate in any manner against a person . . . because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter[.]" A *prima facie* case of retaliation requires an employee to demonstrate that: (1) he engaged in protected activity; (2) the exercise of his rights was known by this employer; (3) that, thereafter, the employer took employment action adverse to him; and (4) there was a causal connection between the protected activity and the adverse employment action. *Brooks v. Lexington-Fayette County Housing Authority*, 132 S.W.3d 790 (Ky. 2004).

In cases where there is no direct evidence of a causal connection, the causal connection of a *prima facie* case of retaliation must be established through circumstantial evidence. *Id*. (citing *Nguyen v. City of Cleveland,* 229 F.3d 559 (6th Cir. 2000)). Circumstantial evidence of a causal connection is "evidence sufficient

-17-

to raise the inference that [the] protected activity was the likely reason for the adverse action." *Nguyen*, 229 F.3d at 566 (internal quotation marks and citation omitted). In most cases, proof is required that: (1) the decision maker responsible for making the adverse decision was aware of the protected activity at the time that the adverse decision was made and (2) there is a close temporal relationship between the protected activity and the adverse action. *Brooks*, 132 S.W.3d at 804. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action. The employee must then show that "but for" the protected activity, the adverse employment action would not have occurred. *Kentucky Center for the Arts v. Handley*, 827 S.W.2d 697, 701 (Ky. App. 1991); *Asbury Univ. v. Powell*, 486 S.W.3d 246, 254 (Ky. 2016).

The circuit court did not err by concluding that Lightfoot failed to make a *prima facie* case of unlawful retaliation because he failed to establish a causal link between his report concerning Edmonson's use of a "poop emoji" and his subsequent dismissal. Lightfoot failed to establish a causal connection due -- in part -- to the passage of time between the complaint and his dismissal. The Kentucky Supreme Court has held that four months between the protected activity and an adverse employment action was "too long to create, by itself, an inference of causality." *Brooks*, 132 S.W.3d at 804.

The record indicates that Lightfoot made his complaint about Edmonson's use of the "poop emoji" in early May 2017; he was dismissed in November 2017. Moreover, Knotts testified that the salaried maintenance position was eliminated as part of corporate reorganization. The fact that Forterra Concrete subsequently hired an hourly wage maintenance worker with no managerial role is immaterial to the analysis. Even considering Lightfoot's brief conversation with Knotts several weeks before his dismissal (wherein he explained that Edmonson "was still just finding ways to pick on me, telling Jason Elder what I am not doing that I am supposed to be doing. . . . You know, it's not getting any better."), Lightfoot failed to counter the alternative, non-retaliatory purpose for the action as explained by Forterra Concrete. Consequently, the circuit court did not err by concluding that Lightfoot failed to show that "but for" his complaint, he would not have been dismissed.

Finally, with respect to the fourth criterion of the burden-shifting analysis under *McDonnell Douglas*, *supra*, and its progeny, we note that Lightfoot was not replaced by a person outside of his protected class. On the contrary, he was replaced by a man of color according to the record, wholly negating this statutory factor.

The summary judgment of the Fayette Circuit Court is affirmed.

ALL CONCUR.

BRIEF FOR APPELLANT:            BRIEF FOR APPELLEE:

Kamp Townsend Purdy            Stephen H. Price
Lexington, Kentucky            Brian C. Neal
                               Nashville, Tennessee