RENDERED: JUNE 12, 2026; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2025-CA-0294-MR

ABRAM SCOTT ADKINS      APPELLANT

v.      APPEAL FROM PIKE CIRCUIT COURT
HONORABLE HOWARD KEITH HALL, JUDGE
ACTION NO. 23-CI-00286

LAZARUS COAL, LLC      APPELLEE

AND

NO. 2025-CA-0320-MR

LAZARUS COAL, LLC      APPELLANT

v.      APPEAL FROM PIKE CIRCUIT COURT
HONORABLE HOWARD KEITH HALL, JUDGE
ACTION NO. 23-CI-00286

ABRAM SCOTT ADKINS      APPELLEE

OPINION
AFFIRMING IN PART, VACATING IN PART, AND REMANDING

** ** ** ** **

BEFORE: THOMPSON, CHIEF JUDGE; CALDWELL AND A. JONES, JUDGES.

CALDWELL, JUDGE: Lazarus Coal, LLC ("Lazarus Coal") appeals from a judgment on a jury verdict in favor of Abram Scott Adkins ("Adkins") on his workers' compensation retaliation claim. Adkins cross-appeals from the amount set forth as the attorney fee award, asserting that the court failed to award a reasonable amount for attorney fees.[1] We affirm the judgment on the jury verdict, but vacate the amount of attorney fees awarded and remand for re-consideration of a reasonable attorney fee with specific findings and lodestar analysis.

**FACTS**

In late August 2022, Lazarus Coal hired Adkins to work as a roof bolter. On February 16, 2023, a rock fell on Adkins' arm as he worked in a Lazarus Coal mine. No one disputes that Adkins suffered a work-related injury.

Adkins immediately told management about his arm injury. Management instructed Adkins to exit the mine and obtain treatment, and another

---

[1] Lazarus Coal's Notice of Appeal was filed in the trial court record on February 27, 2025. This Court's clerk docketed Lazarus Coal's appeal as No. 2025-CA-0320-MR on or about March 12, 2025.

Adkins apparently tendered his Notice of Appeal to the circuit court nearly simultaneously with Lazarus Coal's tendering its Notice of Appeal. Perhaps this is why neither party filed a Notice of Cross-Appeal. Adkins' Notice of Appeal was filed in the trial court record on March 3, 2025. This Court's clerk docketed Adkins' appeal as No. 2025-CA-0294-MR on or about March 7, 2025. Because Lazarus Coal's Notice of Appeal was filed first with the trial court, we later refer to Lazarus Coal as the Appellant/Cross-Appellee and to Adkins as the Appellee/Cross-Appellant.

-2-

employee transported him to Pikeville Medical Center ("the medical center").

After Adkins received stitches, a doctor released him to return to work the next day but restricted him to light duty for several days.

On February 17th, Adkins returned to work and presented his work release with restrictions. According to Adkins, mine superintendent Benny Honaker ("Honaker") said Adkins was already on light duty and told him to resume roof bolting that same day. Adkins returned to roof bolting that day as instructed, but later recounted that immediately returning to roof bolting made his injury feel worse. At the end of his February 17th shift, Adkins was told that he was being switched to night shift. Adkins was the only person on that day transferred to night shift.

After working a few nights, Adkins was informed at the end of his shift on February 23rd that he was being laid off. According to Adkins' complaint and later testimony, Honaker stated at the time that those being laid off had the least seniority, although Adkins knew of other workers who had less seniority but were not laid off.

After he was laid off from Lazarus Coal, Adkins immediately found work with another employer as a roof bolter, albeit at a reduced hourly rate. A few weeks after being laid off, he received an $18,000.00 bill from the medical center for treating his February 16th work injury.

After receiving the medical bill, Adkins consulted an attorney and notified Lazarus Coal's workers' compensation carrier of his injury. (Ultimately, Adkins was not required to pay the medical bill himself.) Adkins filed suit against Lazarus Coal in late March 2023. He asserted he was unlawfully discharged from his employment in retaliation for attempting to receive workers' compensation.

Lazarus Coal filed an answer. It denied being aware of Adkins' pursuing a workers' compensation claim at the time of the layoff, especially since Adkins missed no more than one day of work for the injury. It also asserted that Adkins was transferred to night shift due to a roof bolter on the night shift quitting and that Adkins was laid off along with the whole night shift when the shift was shut down.

After the parties engaged in discovery, Lazarus Coal filed a motion for summary judgment in its favor. It again asserted it had no knowledge that Adkins intended to pursue a workers' compensation claim when he was laid off, especially since he missed no more than one day of work for the injury.

Adkins filed a response, asserting Lazarus Coal was aware that he was pursuing workers' compensation medical benefits based on Adkins' presenting his medical release to a Lazarus Coal official and then being told forms would be filled out to cover the injury. Adkins also argued that Lazarus Coal offered false reasons for his transfer to night shift and his being laid off. For instance, he

-4-

pointed to evidence that another roof bolter with less seniority than him was not laid off despite management's representations that those with the least seniority were being laid off. Adkins also pointed out that a company official's deposition testimony that this less experienced roof bolter was retained due to being certified as a mine emergency technician was contradicted by Lazarus Coal's admission in written discovery. The written discovery indicated that this other roof bolter did not yet have the certification when the layoffs occurred but was simply attending classes to obtain it.

Lazarus Coal filed a reply, arguing that the mere reporting of a minor injury and notifying an insurance carrier about the injury could not have made it aware that Adkins was pursuing a workers' compensation claim. It asserted that since Adkins did not even miss more than a day of work for the injury, Lazarus Coal did not have an obligation to report the injury to the Department of Workers' Claims and had no reason to suspect that Adkins would pursue a workers' compensation claim.

The trial court denied the summary judgment motion and the case proceeded to a jury trial. At trial, Adkins testified that he believed Lazarus Coal had submitted the necessary paperwork to pursue workers' compensation benefits on his behalf until he received the medical bill in the mail. In response to direct examination about whether he was pursuing a workers' compensation claim prior

to formally filing a claim with the assistance of counsel, Adkins initially said he was not. But upon further questioning by his counsel, Adkins explained that he had not previously filled out forms to obtain workers' compensation benefits because he believed that Lazarus Coal personnel were filling out the necessary forms for him. When asked whether he was attempting to have medical benefits paid for his injury, he answered in the affirmative. On cross-examination, Adkins was asked whether he mentioned workers' compensation or anything about pursuing a claim to Lazarus Coal personnel, and he testified to pursuing a claim to get his medical bills paid. Adkins also testified on cross-examination that he did not contact an attorney until late March 2023, after he received the bill from the medical center.

Lazarus Coal's mine manager, Jim Akers ("Akers") testified that he was not aware of there being any problem with Adkins' injury being covered until Adkins sued Lazarus Coal in late March 2023. However, he admitted that he had been aware of Adkins' injury, medical treatment, and his bringing back a work excuse shortly after these events occurred. When asked whether Lazarus Coal contacted its workers' compensation carrier, Akers stated a form was filled out and indicated a staff member would have filled out the form. Akers also admitted he was aware that Adkins was seeking workers' compensation medical benefits.

At the conclusion of Adkins' case, Lazarus Coal moved for a directed verdict. The trial court denied the motion, although the judge orally stated it was a close call.

The jury found in Adkins' favor on the retaliation claim. It awarded him $8,000.00 for lost wages. However, the jury declined to award Adkins anything for emotional distress.

Lazarus Coal filed a motion for judgment notwithstanding the verdict ("JNOV"). Adkins filed a motion for attorney fees, along with documentation of his counsel's time spent working on his case and declarations from several other local practicing attorneys that the hourly rates charged were reasonable. Adkins asserted that an attorney fee of slightly over $50,000.00 was reasonable. He pointed out counsel had expended significant time defending against Lazarus Coal's motions and preparing for trial.

The trial court denied the JNOV motion and entered judgment in accordance with the jury's verdict. Shortly thereafter, it also entered a supplemental judgment in which it awarded Adkins attorney fees of $8,000.00 without any further explanation.

Lazarus Coal filed a timely appeal from the judgment on the jury's verdict. Adkins filed a timely appeal from the $8,000.00 attorney fee award,

asserting the trial court failed to award a reasonable amount for attorney fees and failed to make sufficient findings.

Further facts will be set forth as needed in our analysis.

## ANALYSIS

First, we consider arguments about the denial of the motions for a directed verdict and for JNOV.

> In ruling on either a motion for a directed verdict or a motion for judgment notwithstanding the verdict, a trial court is under a duty to consider the evidence in the strongest possible light in favor of the party opposing the motion. Furthermore, it is required to give the opposing party the advantage of every fair and reasonable inference which can be drawn from the evidence. And, it is precluded from entering either a directed verdict or judgment n.o.v. unless there is a complete absence of proof on a material issue in the action, or if no disputed issue of fact exists upon which reasonable men could differ.

*Taylor v. Kennedy*, 700 S.W.2d 415, 416 (Ky. App. 1985).

### Standard of Review for Denial of Directed Verdict and JNOV

> The standard of review applicable to a denial of a motion for directed verdict and a judgment notwithstanding the verdict is the same. The appellate court is required to consider the evidence in the strongest light possible in favor of the opposing party. *Taylor v. Kennedy*, 700 S.W.2d 415, 416 (Ky. App. 1985). Either motion is properly granted only if there is a "complete absence of proof on a material issue in the action, or if no disputed issue of fact exists upon which reasonable men could differ." *Id*.

*Dollar General Partners v. Upchurch*, 214 S.W.3d 910, 915 (Ky. App. 2006).

Next, we note specific requirements plaintiffs must fulfill to survive a defendant's motion for directed verdict in workers' compensation retaliation cases.

**Elements of a Workers' Compensation Retaliation Claim and Requirements to Get Past a Directed Verdict Motion**

> KRS[2] 342.197 provides in pertinent part:
>
> (1) No employee shall be harassed, coerced, discharged, or discriminated against in any manner whatsoever for filing and pursuing a lawful claim under this chapter.
>
> . . .
>
> (3) Any individual injured by any act in violation of the provisions of subsection (1) or (2) of this section shall have a civil cause of action in Circuit Court to enjoin further violations, and to recover the actual damages sustained by him, together with the costs of the law suit, including a reasonable fee for his attorney of record.

Binding precedent applying KRS 342.197(1) establishes a four-part test for establishing a *prima facie* case of workers' compensation retaliation to survive a motion for directed verdict:

> A claim under KRS 342.197(1) is subject to the rule that to avoid a directed verdict in a claim for employment retaliation, the plaintiff must first establish a prima facie case. The plaintiff can meet this initial burden by proof that: (1) he engaged in a protected activity; (2) the defendant knew that the plaintiff had

---

[2] Kentucky Revised Statutes.

> done so; (3) adverse employment action was taken; and (4) that there was a causal connection between the protected activity and the adverse employment action. *Brooks v. Lexington-Fayette Urban County Housing Authority*, 132 S.W.3d 790 (Ky. 2004).

*Upchurch*, 214 S.W.3d at 915.

Lazarus Coal does not appear to dispute that Adkins showed an adverse employment action. However, it contends that Adkins failed to offer proof of engaging in a protected activity or Lazarus Coal's knowing of such protected activity prior to taking adverse employment action such as laying Adkins off.

**Viewing the Evidence[3] in the Light Most Favorable to Adkins, There Was Not a Complete Lack of Proof that He Engaged in the Protected Activity of**

---

[3] Lazarus Coal provided specific references to the record, as required by Kentucky Rules of Appellate Procedure ("RAP") 32(A)(3)-(4) (except for not always providing a specific date in references to the trial recording, *see* RAP 31(E)(4)), in both its statement of the case and in its argument alleging the trial court erred in denying its motions for a directed verdict and JNOV based on the evidence presented. As Lazarus Coal points out, Adkins' appellee brief was similarly required to provide specific citations to the record. *See* RAP 32(B)(3)-(4). Adkins' appellee brief did provide some references to the written record. But as Lazarus Coal's reply brief points out, Adkins often cited to his representations in his summary judgment response rather than directly to evidence such as trial testimony (in fact, he cited to no specific portion of any trial recording in his appellee brief). Adkins' references to the written record often allude to discussions of deposition testimony in his summary judgment response rather than directly to where in the record transcribed deposition testimony is located. His appellee brief also sometimes states that witnesses testified at trial consistent with their deposition testimony, although without any specific references to a particular date and time of the trial recording.

Despite the lack of specific references to evidence in the record in the appellee brief, relevant portions of trial testimony were not difficult to locate given the specific references to the trial recording in the appellant and reply briefs and our own viewing of much of the trial. We urge Adkins' counsel to provide more specific references to the written record and video-recordings in future briefs—especially to evidence in the record where, as here, there is a directed verdict issue. Nonetheless, our review was not substantially hampered by the lack of specific reference to evidence in the record in Adkins' appellee brief. Thus, we leniently decline to impose sanctions. *See* RAP 10(B), RAP 31(H)(1). However, we warn counsel that we are not obligated to be so lenient in the future.

-10-

**Pursuing Workers' Compensation Benefits or that Lazarus Coal Knew He Was Pursuing Such Benefits When It Took Adverse Action**

Certainly, filing a workers' compensation claim is protected activity. KRS 342.197(1). And clearly, Adkins had not formally filed a workers' compensation claim before he was laid off by Lazarus Coal. However, published precedent makes clear that an employee does not have to show that he/she formally filed a workers' compensation claim to succeed on a retaliation claim. "[A]n employee may have a cause of action for retaliatory discharge even if he has not yet filed a formal workers' compensation claim." *Bishop v. Manpower, Inc. of Cent. Kentucky*, 211 S.W.3d 71, 75 (Ky. App. 2006) (citing *Overnite Transportation Co. v. Gaddis*, 793 S.W.2d 129, 130-31 (Ky. App. 1990)).

An employee's pursuing workers' compensation benefits (even without formally filing a workers' compensation claim) is a protected activity:

> it is possible in Kentucky for a worker to draw workers' compensation benefits without ever filing a claim for compensation. It is absurd to conclude that he was not "pursuing a lawful claim," even though he notified his employer of his injuries and received the benefits provided by law, simply because a formal claim for compensation was never filed. Although the legislature used the connective word "and" in according protection for those persons "filing and pursuing a lawful claim," we think there is reasonable justification to regard "and" as "or" in KRS 342.197 in order to accomplish its purpose. This has the effect of placing employees who have filed *or* are pursuing a lawful claim for workers' compensation benefits within the protective ambit of the anti-retaliation provision. We hold that under the facts of

-11-

this case, including the receipt of voluntary compensation payments, Mr. Gaddis was pursuing a lawful claim within the purview of KRS 342.197. To hold otherwise would allow employers to easily avoid the statute by firing the injured employee before he could file, a relatively easy circumvention of the statute which we do not believe the legislature intended.

*Gaddis*, 793 S.W.2d at 132.

Lazarus Coal argues there was a lack of evidence that Adkins was pursuing a workers' compensation claim. It emphasizes that in response to his attorney's question whether he was pursuing a workers' compensation claim from the date of injury until the day in March 2023 when he reported the injury to the compensation carrier after consulting counsel, Adkins said "no" and when asked "you weren't pursuing one?", Adkins again said "no." However, it admits that upon further questioning by his counsel, Adkins explained he was not "doing any paperwork" because he believed Lazarus Coal personnel were filling out forms for him and when asked whether he was attempting to have medical benefits paid for his injury, Adkins said "yes, sir."

While Adkins did initially respond "no" when asked whether he was pursuing a workers' compensation claim, the jury could have reasonably inferred that he simply initially misunderstood his counsel's question. It could also have reasonably construed his testimony affirming he was seeking medical benefits for his injury as evidence that he was pursuing workers' compensation benefits even

-12-

though he had not yet formally filed a workers' compensation claim when he was laid off.  Moreover, based on our review of the trial, mine manager Akers admitted he was aware that Adkins was pursuing workers' compensation medical benefits.  Thus, considering the evidence in the light most favorable to Adkins and making all reasonable inferences in his favor, we cannot say that there was a complete lack of evidence of Adkins' pursuing workers' compensation benefits or of Lazarus Coal's knowledge that he was pursuing such benefits when Adkins was laid off.

This is true even though Lazarus Coal also argues Adkins was not pursuing a workers' compensation claim because he immediately returned to work the day after his injury, quoting *Southerland v. Hardaway Management Co., Inc.*, 41 F.3d 250, 256 (6th Cir. 1994):

> We agree with the district court that Ms. Southerland's documentary and deposition evidence do not establish the elements of a retaliation claim.  There is no indication that any intent to pursue a workers' compensation claim existed at the time of the plaintiff's discharge, or that such a course of action was discussed.  To the contrary, she was seeking an immediate return to her previous job as manager, claiming that she was able to perform all the required duties of the job.  Only after she was denied reinstatement did the plaintiff turn to the Workers' Compensation Act for relief.

Here, Adkins returned to work the day after his injury, although he presented a doctor's release restricting him to light duty, and he continued to work at his usual position for a few more shifts before he was laid off.  In contrast,

Southerland continued to work after her injury until her doctor instructed her not to return to work a few days later. Also, Southerland did not return to work for a couple of months during which her employer hired someone else to perform her duties. According to Southerland, she was terminated on the day she told her employer she was ready to work and presented a work release with restrictions. *Id.* at 252. Moreover, a representative for Southerland's employer testified she was let go because she could not perform her job duties and that there was no job for Southerland consistent with her medical restrictions, especially since the employer had permanently hired the employee who had taken over Southerland's job duties during her convalescence. *Id.* at 255-56. The Sixth Circuit also emphasized that Southerland "was injured while performing work that she later claimed was not required by her position" and found no reason to disbelieve the employer's representation that she was discharged due to inability to perform her job, noting evidence Southerland would have been rehired "if she could have returned to work with a full release." *Id.* at 256.

Not only are the facts here somewhat distinct from *Southerland*, 41 F.3d 250, but the Sixth Circuit's interpretation of Kentucky law about workers' compensation retaliation is not binding on this Court. *See Kindred Nursing Centers Limited Partnership v. Cox*, 486 S.W.3d 892, 896 (Ky. App. 2015) ("[A] federal court's determination of state law in a diversity case is not binding on a

-14-

state court.").[4]  Moreover, as Adkins points out, KRS 342.197(1) does not expressly state an exception for cases in which the plaintiff's injury does not cause him/her to miss more than one day of work.

Adkins also asserts that he did everything he was required to do to seek workers' compensation medical benefits for his injury prior to his being laid off.  He emphasizes he immediately informed management of his injury, and immediately sought and obtained treatment.  He also stresses he presented his work release with restrictions to management the next day and was told that Lazarus Coal personnel would fill out the necessary forms so that his medical bills for the injury would be paid.

However, Lazarus Coal contends that Adkins merely inquired about his medical bills being paid by workers' compensation.  It suggests this is insufficient to show that he was pursuing a workers' compensation claim or that his employer knew he was pursuing a workers' compensation claim.  It cites for our consideration this Court's opinion in *Hall v. Hammond Transportation, Inc.*, No. 2008-CA-000836-MR, 2009 WL 3231392 (Ky. App. Oct. 9, 2009)

---

[4] Also, *Southerland* was resolved by summary judgment rather than by trial or directed verdict. 41 F.3d at 252-53.  And federal courts have long reviewed summary judgment motions under a different standard than that employed by Kentucky state courts.  *See generally Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480-83 (Ky. 1991).

(unpublished). Lazarus Coal admits this unpublished opinion is not binding authority. *See* RAP 40(D)(1); RAP 41(A).

Nonetheless, Lazarus Coal asserts that *Hall* is factually like the present case and demands a similar result. Lazarus Coal points out we stated in *Hall* that the employer was only aware of the plaintiff's ankle injury, the plaintiff's seeking medical treatment, and the compensation carrier's denial of coverage. *See id*. at *7. Lazarus Coal quotes our statement, that based on the employer's being aware of only these three facts: "Absent additional evidence, this is not enough to demonstrate that Hammond knew Hall was pursuing a claim." *Id*. at *7.

Contrary to Lazarus Coal's argument, Adkins asserts that *Hall* is factually distinguishable. For instance, he points out that Hall failed to provide medical information to the compensation carrier, failed to contest the carrier's denial of coverage, and failed to contact his employer for two months. *See id*. He also points out that Hall failed to respond to his employer's phone calls to help fill out workers' compensation forms and Hall failed to complete medical information and waiver forms which the employer mailed to him. *Id*. at *2-4. Furthermore, we also noted that although Hall initially informed his employer about his injury, he did not describe the injury as being work-related at that time. *Id*. at *6.[5]

_____

[5] Though not binding on us and not cited or discussed by the parties, we find persuasive an unpublished federal district court opinion distinguishing *Hall* on facts which bear some resemblance to those in the present case. *See Vaughan v. Berry Plastics Corp.*, No. 1:11CV-

In its reply brief, Lazarus Coal contends that the steps Adkins testified to taking all occurred on the same day he suffered his injury and returned to the mine office. It also asserts that Adkins simply testified to a conversation with Honaker, which lasted just a few minutes. Basically, Adkins testified to being told the company would take care of it (*i.e.*, submitting forms for coverage of medical expenses for the injury). In response to being asked if he specifically said anything about pursuing a workers' compensation claim, Adkins testified to saying, "That is me pursuing the claim to get my medical bills paid for."

While we recognize that Adkins may not have clearly testified to explicitly stating he was pursuing a "workers' compensation claim" to his employer, he testified about taking the necessary steps to make sure that he did not have to pay his medical bills for the work injury and that his employer would be responsible for paying these costs. Based on this testimony, a jury could reasonably find that he conveyed an intent to seek workers' compensation medical benefits. This is especially true considering Akers' testimony that he was aware that Adkins was seeking workers' compensation medical benefits.

00082-JHM, 2013 WL 230825, at *4-5 (W.D. Ky. Jan. 22, 2013) (unpublished). Like Adkins, Vaughan was terminated prior to his filing a workers' compensation claim.

The *Vaughn* court, in discussing why summary judgment in favor of the defendant employer was denied, stated that in contrast to *Hall*, plaintiff Vaughan had submitted documentation indicating his injury was work-related and required treatment, submitted a work accident report to the plant nurse, and submitted a work excuse from a doctor—all actions which demonstrated he was pursuing a workers' compensation claim. *Id.* at *5.

-17-

Therefore, considering the evidence in the light most favorable to Adkins and making all reasonable inferences in his favor, we cannot say there is a complete lack of evidence that Adkins was pursuing a claim for workers' compensation medical benefits or that Lazarus Coal was aware of his pursuing such benefits.

**Evidence Was Sufficient to Get Past Directed Verdict Despite Lazarus Coal's Not Being Obligated to Report Injury Resulting in No More than One Day Off Work Pursuant to KRS 342.038(1)**

Lazarus Coal contends that there is no way it could have known that Adkins intended to file a workers' compensation claim since he did not even miss a full day of work for his injury. It cites KRS 342.038(1) which imposes a duty for the employer to report a work-related injury to the Department of Workers' Claims only if the employee misses more than one day of work.

In response, Adkins asserts that an employee could still express an intent to pursue a workers' compensation benefit and could still have a valid claim for retaliation pursuant to KRS 342.197(1) even if his/her employer is not required to report the injury under KRS 342.038(1). Again, he points to the lack of express requirement that the injury meet any specific threshold of severity (such as causing the employee to miss more than one day of work) in KRS 342.197(1).

We agree with Adkins. Binding published precedent calls for broad interpretation of the protections afforded to workers in KRS 342.197(1) and for

-18-

construing efforts to secure workers' compensation benefits as pursuing a workers' compensation claim even when the worker has not formally filed a claim at the time of the adverse action. *Gaddis*, 793 S.W.2d at 130-32. Thus, especially given the lack of express severity requirement in KRS 342.197(1), the fact that an employer is not required to report injuries resulting in no more than a day's missed work to the Department of Workers' Claims under KRS 342.038(1) does not preclude the employee's prevailing on a workers' compensation retaliation claim. This is true so long as the employee offers proof of the four required elements to make a *prima facie* case and get past the employer's directed verdict motion. *See generally Upchurch*, 214 S.W.3d at 915.

Moreover, the one-day rule Lazarus Coal refers to is set forth in KRS 342.038. It does not bar an employee who misses less than a day of work from receiving workers' compensation benefits. Rather, the statute simply provides that the employer is required to keep a record of any injury to an employee in the course of his/her employment and that the insurance carrier must file with the Department of Workers' Claims a report of any injuries causing an employee to miss more than one day of work. KRS 342.038(1). Notably, however, KRS 342.038(3) requires an employer to "report to its workers' compensation insurance carrier or the party responsible for the payment of workers' compensation benefits *any work-related injury* or disease or alleged work-related injury or disease *within*

*three (3) working days of receiving notification of the incident or alleged incident.*"

(Emphasis added.) This report puts the carrier on notice of the potential for a

workers' compensation claim for which benefits may be required to be paid and is

triggered regardless of the number of days, if any, the employee has missed.

Importantly, the Workers' Compensation Act provides that: "Every

employer subject to this chapter shall be liable for compensation for injury . . .

without regard to fault as a cause of the injury, occupational disease, or

death." KRS 342.610(1). An injury is "any work-related traumatic event or series

of traumatic events, including cumulative trauma, arising out of and in the course

of employment which is the proximate cause producing a harmful change in the

human organism evidenced by objective medical findings." KRS

342.0011(1). One type of compensation that an employer is liable to provide is

payment for "the cure and relief from the effects of an injury[,]" including "the

medical, surgical, and hospital treatment, . . . as may reasonably be required at the

time of the injury and thereafter for the length of time set forth in this

section[.]" KRS 342.020(1). There is no threshold requirement that a worker miss

more than a day of work to be eligible for such benefits. *Mountain Clay, Inc. v.

Frazier*, 988 S.W.2d 503, 505 (Ky. App. 1998) ("[L]iability for medical expenses

requires only that an injury was caused by work and that medical treatment was

necessitated by the injury[.]").

The requirement as it relates to the employee is that he must provide notice to his employer of the accident causing the injury "as soon as practicable after the happening thereof." KRS 342.185(1). This statute also provides that the notice may be "made by any person claiming to be entitled to compensation." By providing notice of the injury, Adkins in effect let Lazarus Coal know he was claiming entitlement to compensation. Thus, the jury could properly rely on the report Adkins made to find that Lazarus Coal was aware that Adkins was claiming entitlement to workers' compensation, at least as related to his medical treatment incurred up to that point. Importantly, a retaliation claim does not require the claimant to have actually filed a claim. *See First Property Management Corp. v. Zarebidaki*, 867 S.W.2d 185, 189 (Ky. 1993) (the retaliation statute is implicated when an employer is aware that the employee intends to pursue a lawful workers' compensation claim); *Bishop*, 211 S.W.3d at 75 ("an employee may have a cause of action for retaliatory discharge even if he has not yet filed a formal workers' compensation claim.").

**Sufficient Evidence Was Presented to Get Past Directed Verdict Regarding Causation Requirement**

As Adkins points out in his brief, the plaintiff is not required to show that his/her pursuing a workers' compensation claim is the sole or primary reason for the adverse employment action. The plaintiff must only show that such pursuit

is a substantial, motivating factor in the employer's decision to discharge the employee to meet the causation requirement. *Zarebidaki*, 867 S.W.2d at 188-89.

To the extent that Lazarus Coal challenges the sufficiency of proof of the causation requirement, we conclude that there was not a complete lack of evidence of causation when considering the evidence in the light most favorable to Adkins and making all reasonable inferences in his favor. This is especially true given the conflicting evidence about the reasons asserted by Lazarus Coal for transferring Adkins to the night shift and then terminating his employment.

**Despite Lack of Full Compliance with Appellate Briefing Rule Requiring Preservation Statement with Specific References to the Record at the Beginning of an Appellant Brief Argument, Adkins Identified Where the Issue About a Reasonable Attorney Fee Was Preserved at the End of His Statement of the Case and the Issue Was Clearly Preserved**

Lazarus Coal accurately points out that Adkins' appellant brief does not fully comply with the requirement for a preservation statement **at the beginning of the argument**, accompanied by specific citation(s) to the record, identifying if or how an issue was raised to the trial court and therefore preserved for review. *See* RAP 32(A)(4) (providing appellant brief "shall contain at the beginning of the argument a statement with reference to the record showing whether the issue was properly preserved for review and, if so, in what manner."). We further note Adkins did not respond to nor attempt to correct the asserted lack of proper preservation statement in its appellant brief by filing a reply brief.

Nonetheless, despite the lack of full compliance with the requirements of RAP 32(A)(4), we conclude Adkins substantially set forth where he preserved the attorney fee issue for review by citing to the page number of the written record at which the beginning of his motion for attorney fees appears.[6] Moreover, Adkins' statement of facts also contained a citation to the written record for the page number at which the trial court's order and supplemental judgment resolving the attorney fee issue appeared.[7]

Despite the lack of ideal compliance with RAP 32(A)(4), Adkins' counsel substantially complied with the requirement of identifying with reference to the record if and how the attorney fee issue was preserved. More significantly, the issue about the amount of the attorney fee sought was clearly raised to the trial court and thus preserved for review by Adkins' filing his motion for attorney fees accompanied by detailed summaries of the time spent by his attorneys and their staff in working on the case and declarations by other practicing local attorneys that the proposed rates were reasonable. His motion for attorney fees clearly

---

[6] Better practice, however, would have been to include more specific page references identifying where Adkins specifically set forth the time his attorneys and their staff devoted to the case and the rates his attorneys believed were reasonable to charge, as well as specific page references identifying where other local attorneys declared that these rates were reasonable.

[7] However, this citation to the trial court's resolution of this issue confusingly appeared immediately after a statement about the specific fee sought reflecting the time, efforts, and expertise of counsel and staff rather than after a clear reference to the trial court's resolution of the attorney fee issue. (*See* page 8 of "Appellant's brief" filed in No. 2025-CA-0294-MR.)

requested an attorney fee based on his lodestar calculations of about $51,000.00 based on the hours expended at the proposed rates.[8] He also cited authority about using the lodestar method to calculate reasonable attorney fees and the importance of awarding reasonable fees to encourage competent counsel to represent workers in actions to enforce their statutory rights.

Moreover, the complete lack of explanation for the trial court's reducing the requested attorney fee from the approximately $51,000.00 claimed down to $8,000.00 in resolving this issue is perplexing. This amount awarded for attorney fees mirrors the amount the jury awarded for lost wages. However, we are unaware of any authority forbidding an attorney fee awarded pursuant to statute from exceeding the amount recovered by the plaintiff for his/her claim.

**Standard of Review for Amount of Attorney Fees Awarded Pursuant to Statute Calling for Awarding Reasonable Attorney Fees to Prevailing Plaintiffs**

Recent published precedent from our Supreme Court indicates we must review the *amount* of attorney fees awarded by a trial court pursuant to a Kentucky statute authorizing or mandating reasonable attorney fees for abuse of discretion:

---

[8] Adkins' counsel proposed a $300.00 per hour rate for his attorneys' work. Attached time records indicated one of his attorneys spent almost 141 hours on the case while his other attorney spent almost 29 hours on the case. He also proposed a $75.00 per hour rate for his attorneys' paralegal's work and indicated the paralegal spent almost five hours on the case.

Kentucky law makes clear that a trial court's discretion in setting [attorney] fees is not unlimited. When a statute authorizes or mandates an award of "reasonable" attorney's fees, granting these awards is a matter of law and reviewed de novo; however, the awarded amount is reviewed to determine "whether the circuit court's determination constitutes an abuse of discretion." *Hunt v. N. Am. Stainless*, 482 S.W.3d 796, 799 (Ky. App. 2016).

The amount must be anchored in the evidence and guided by established factors.

*Wheeler v. City of Pioneer Village*, 723 S.W.3d 764, 776–77 (Ky. 2025).

### Trial Court Abused Its Discretion in Awarding Only $8,000.00 in Attorney Fees with No Specific Findings or Lodestar Analysis

In *Wheeler*, a plaintiff prevailed on a wage and hour claim. Similarly to KRS 342.197(3), the relevant statute (KRS 337.385(1)) provided for recovery of "costs and such reasonable attorney's fees as may be allowed by the court." 723 S.W.3d at 777. And somewhat similarly to the present case, the trial court in *Wheeler* awarded a relatively modest amount of attorney fees without specifically explaining why the court decided to substantially reduce the award sought:

Shortly after the March 2023 Order, but before the July 2023 Order, Officer Wheeler's legal counsel requested $1,356.35 in costs and $91,031.50 in fees. She supported her motion/notice with an hourly breakdown of 299.10 hours performed from three attorneys ($325 to $365/hour), five law clerks ($100 to $165/hour), and two paralegals ($165/hour). She tendered a personal affidavit of her legal experience and examples of similar rates for similar work in the same region.

The trial court's August 2023 Order determined the request for $91,031.50 in fees was not reasonable in relation to the claim, an award of $5,443.57, and that Officer Wheeler's legal counsel's rate of $365.00/hour exceeded "a reasonable hourly rate." The court awarded $2,500.00 in combined attorney's fees and costs but did not elaborate on how it arrived at this amount.

*Id.* at 777.

Our Supreme Court agreed with the prevailing plaintiff's argument that the lower court abused its discretion in drastically reducing the amount of the attorney fee award without any explanation other than a general assertion that the rates claimed were not reasonable, explaining as follows:

This Court has described a "lodestar" method of calculating reasonable attorney's fees in employment claims as consisting of the product of counsel's reasonable hours, multiplied by a reasonable hourly rate, thus providing a "lodestar" figure which may then be adjusted to account for various special factors in the litigation. *Meyers v. Chapman Printing Co.,* 840 S.W.2d 814, 826 (Ky. 1992) (citing the analysis in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983)). Although the court recognized Wheeler's entitlement to an award of "reasonable" fees under the governing wage and hour statute, it reduced the fee petitioned to a flat $2,500.00 without explanation.

Here, the trial court's drastic reduction of a detailed petition without findings fails to satisfy those requirements. On remand, the trial court should closely evaluate the record of the litigation, including the hours devoted to discovery, the procedural hurdles presented, continuances filed by the defense, and the preparation necessary to present a wage-and-hour case at trial. Such cases are often intensive, involving review of records,

examination of statutory and local ordinances, and preparation of multiple witnesses. To disregard the scope of that work by arbitrarily capping the fee risks undermining the statutory scheme itself.

It bears emphasis that the purpose of fee-shifting provisions in wage and hour laws is not merely to compensate prevailing counsel, but to ensure meaningful enforcement of the law. If awards are untethered from the actual work required, employees—who by statute are guaranteed their earned wages—may be unable to secure representation. Likewise, employers determined to have acted unlawfully might be incentivized to prolong litigation, knowing that counsel for employees may never be adequately compensated relative to the work performed.

This Court has since adopted the "lodestar" method that attorney's fees awarded should consist of the product of counsel's reasonable hours multiplied by a reasonable hourly rate, which may then be subject to adjustment for special circumstances. *Meyers*, 840 S.W.2d at 826.

KRS 337.385 mandates "reasonable attorney's fees" to prevailing employees reflecting legislative judgment that wage protections must be meaningfully enforceable. That enforcement depends on ensuring employees can secure competent representation. Wheeler's counsel submitted a detailed affidavit documenting nearly 300 hours of work at prevailing market rates. The court reduced an affidavit of attorney's fees with a "contemporaneous record" of hourly breakdown and dates from $91,031.50 to $2,500.00 combined with costs without explanation. This arbitrary and unfounded reduction was an abuse of discretion.

The Court of Appeals correctly determined that the trial court's reduction was unsupported and remanded for reconsideration. We affirm that determination. On

-27-

remand, it is recommended that the trial court assess the petition in light of the governing factors, articulate its reasoning with specificity, and award a fee that reflects the actual work performed and the legislative purpose of ensuring employees have access to effective legal representation in vindicating their statutory rights.

*Wheeler*, 723 S.W.3d at 777-78.

Although there appears to be no Kentucky published precedent squarely addressing how a reasonable attorney fee is to be determined in a workers' compensation retaliation case,[9] a state law claim for workers' compensation retaliation is analogous to a state law wage and hour claim. Like wage and hour laws which contain provisions for prevailing plaintiffs to obtain reasonable attorney fees to ensure that workers can obtain legal representation to enforce their statutory rights, *see id.* at 777-78, KRS 342.197(3) similarly states that prevailing workers' compensation retaliation plaintiffs may recover reasonable attorney fees. Obviously, KRS 342.197(3) is also aimed at making sure workers can obtain legal representation to enforce their right not to suffer adverse action for pursuing workers' compensation claims. Moreover, like wage and hour claims, workers' compensation retaliation claims are employment claims, so it makes

---

[9] *But see Colorama, Inc. v. Johnson*, 295 S.W.3d 148, 154 (Ky. App. 2009) (affirming award of attorney fees since the motion for directed verdict in workers' compensation retaliation case was properly denied and KRS 342.197(3) authorized such an award of attorney fees, but also stating review of attorney fee issue was precluded pursuant to prior, then-applicable authority holding that appellate courts lacked jurisdiction to review attorney fee awards where the attorney was not named as a party to the appeal). *Colorama*, 295 S.W.3d 148, did not address whether the amount of the attorney fee awarded was reasonable, however.

sense that "lodestar analysis" is called for in determining the reasonableness of the fee awarded. *See Wheeler*, 723 S.W.3d at 777 (citing *Meyers*, 840 S.W.2d at 826).

Pursuant to *Wheeler*, 723 S.W.3d at 777, we conclude that the trial court abused its discretion in awarding only $8,000.00 in attorney fees without any findings discussing why it rejected the over $50,000.00 lodestar figure set forth by Adkins and without any findings setting forth what the trial court believed to be reasonable rates or reasonable hours expended.

We vacate the $8,000.00 attorney fee award and remand for re-consideration of a reasonable attorney fee with specific findings about a lodestar figure derived from multiplying reasonable hours by reasonable rates and then adjusting for any special circumstances. *See id.* at 777. In other words, on remand the trial court must assess a reasonable attorney fee "in light of the governing factors, articulate its reasoning with specificity, and award a fee that reflects the actual work performed and the legislative purpose of ensuring employees have access to effective legal representation in vindicating their statutory rights." *See id.* at 778.

Further arguments in the parties' briefs, which are not discussed herein, have been determined to lack merit or relevancy to our resolving these appeals.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment on the jury verdict, but we VACATE the $8,000.00 attorney fee award and REMAND for re-determination of a reasonable attorney fee with proper lodestar analysis and consistent with the guidelines set forth in *Wheeler*, 723 S.W.3d at 777-78.

ALL CONCUR.

| BRIEFS FOR LAZARUS COAL LLC: | BRIEFS FOR ABRAM SCOTT ADKINS: |
| --- | --- |
| Lawrence R. Webster<br>Pikeville, Kentucky | Nathan D. Brown<br>Williamson, West Virginia |